315 Ga. 651
FINAL COPY

S22A1080.  CHARLES v. THE STATE.

COLVIN, Justice.

Fred Jason Charles appeals his convictions for malice murder

and related offenses in connection with the July 2015 shooting death

of Stephanie Daniel.[1]  Charles argues that (1) the trial evidence was

---

[1] Daniel died on July 5 or 6, 2015.  In March 2016, a Gordon County grand jury returned a 23-count indictment against Charles and co-defendant Christopher Reid Scoggins.  Charles was charged with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on possession of a firearm by a convicted felon (Count 3), aggravated assault (Count 5), two counts of possession of a firearm by a convicted felon (Counts 6 and 7), theft by taking (Count 10), conspiracy to commit arson in the second degree (Count 11), and possession of a firearm during commission of a felony (Counts 12 through 17).  Co-defendant Scoggins was jointly charged in Counts 1, 2, 5, 10, and 11 and separately charged with felony murder predicated on possession of a firearm by a convicted felon (Count 4), possession of a firearm by a convicted felon (Counts 8 and 9), and possession of a firearm during commission of a felony (Counts 18 through 23).  Before trial, Charles joined a motion filed by Scoggins to bifurcate trial on the counts premised on the defendants' felon status, including the charges of felony murder and possession of a firearm by a convicted felon.  After hearing arguments from the parties, the court denied the motion.

At a September 2016 trial, the jury found Charles and Scoggins guilty on all counts.  On October 6, 2016, the court sentenced Charles as a recidivist under OCGA § 17-10-7 (a) and (c) to life in prison without the possibility of parole for Count 1, five years concurrent to Count 1 for Count 6, ten years

constitutionally insufficient to support his convictions, (2) the trial court failed to appropriately question jurors regarding a potential issue of juror irregularity, (3) the trial court erred in denying his pretrial motion to bifurcate the trial and try separately the charges for which his status as a felon was material, and (4) trial counsel was ineffective for failing to object to the State using a felon-in-possession-of-a-firearm charge as a predicate for felony murder. For the reasons explained below, we affirm.

1. Viewed in the light most favorable to the jury verdicts, the trial evidence showed the following. On July 5, 2015, Charles was living with his father, Herbert Charles ("Herbert"), at Herbert's mobile home in Calhoun, Georgia. Daniel, who was Charles's girlfriend, had been staying in Charles's portion of the mobile home

consecutive to Count 1 for Count 10, five years consecutive to Count 10 for Count 11, five years consecutive to Count 11 for Count 12, and five years concurrent to Count 12 for Count 16. The court merged for sentencing purposes or vacated by operation of law the remaining counts.

Charles filed a motion for new trial on October 28, 2016, which he amended through new counsel on October 3, 2018, and January 28, 2022. On February 3, 2022, following a hearing, the court denied the motion for new trial as amended. Charles timely appealed. The case was docketed to our August 2022 term and submitted for a decision on the briefs.

for several days, and Charles's friend, Christopher Reid Scoggins, was at the mobile home early in the day. Around noon, Charles and Scoggins drove Daniel's Nissan Xterra down the road, stopping at a neighbor's house so Charles could show him a revolver and ask where they could shoot it. That evening, around 7:30 or 8:00, a different neighbor saw Daniel enter the mobile home. Shortly thereafter, the neighbor saw Charles throw a firecracker and then drive away in Daniel's Xterra.

Herbert went outside to retrieve his dog, who was afraid of fireworks. When he came back in, he saw Daniel lying on a bunch of clothes on the bed in Charles's bedroom and asked if she was okay. Daniel did not respond, and Herbert "figured she had just went to sleep." But when Charles and Scoggins returned, Herbert told them to check on her, at which point the two men went into Charles's bedroom and "shut the door."

Later, Charles and Scoggins left together in Daniel's Xterra. Between 9:21 and 11:00 p.m., Scoggins's girlfriend called Scoggins several times and overheard Scoggins tell Charles, "[D]on't shoot

3

yourself in the toe," and, "[I]t's loaded."

Sometime after Charles and Scoggins left the mobile home, Herbert discovered that Daniel was still lying in the same place in Charles's bedroom, and, upon seeing blood, he called 911. Officers responded and found Daniel dead with a bullet hole in her chest and blood on her arm. Officers also found a bullet hole in one of Charles's bedroom windows, and a medical examiner testified that a wound on Daniel's upper right arm was consistent with a graze from a bullet.

In the early hours of July 6, Scoggins called his sister, Crystal Scoggins ("Crystal"), to ask for a ride. Crystal picked up Charles and Scoggins on a forestry road that intersected Manning Mill Road in the Strawberry Mountain area of Walker County, Georgia. At the end of the forestry road, officers later found a Nissan Xterra that had been burned down to the metal frame. A partial vehicle identification number recovered from the Xterra matched that of Daniel's vehicle.

After picking up Charles and Scoggins, Crystal drove the men

4

back to her house, where Charles made a noose with a belt. Holding the noose in Crystal's presence, he "dared [her] to say a word." In the afternoon, Crystal and Scoggins dropped off Charles at a convenience store. Later, an officer responding to a tip about Charles's whereabouts located Charles hiding in the woods behind a trailer.

At trial, a firearms examiner testified that a bullet recovered from Daniel's body was likely fired from a revolver. Although Herbert owned a revolver, the firearms examiner ruled out Herbert's revolver as the source of the bullet that killed Daniel, and Herbert's hands tested negative for gunpowder residue.

2. Charles claims that "the evidence was insufficient to convict him on any count[ ] in the indictment" under *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). On appeal, it is the defendant's burden to show that the trial evidence was insufficient as a matter of constitutional due process to support his convictions. See *Davis v. State*, 312 Ga. 870, 873 (1) n.2 (866 SE2d 390) (2021) (affirming a defendant's convictions where his "only"

5

sufficiency argument that the State failed to disprove his self-defense theory lacked merit and he "ha[d] not otherwise shown that the evidence supporting the child cruelty convictions was insufficient as a matter of constitutional due process"). See also *United States v. Tantchev*, 916 F3d 645, 650 (II) (A) (7th Cir. 2019) ("It is the defendant's task to convince us of the insufficiency of the evidence[.]"); *United States v. Mack*, 729 F3d 594, 604 (II) (B) (6th Cir. 2013) (noting that "the defendant [must] carry [a] heavy burden to show that the evidence was insufficient"). When assessing the sufficiency of the evidence, "we view the evidence presented at trial in the light most favorable to the verdicts," *Drennon v. State*, 314 Ga. 854, 861 (3) (880 SE2d 139) (2022), and "we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the jury," *Davis*, 312 Ga. at 872-873 (1) (citation and punctuation omitted). To prevail on a sufficiency challenge, a defendant must show that, even when the evidence is construed in the light most favorable to the verdicts, "[no] rational trier of fact

could have found the defendant guilty beyond a reasonable doubt." *Davis*, 312 Ga. at 872 (1). See also *United States v. Griffin*, 684 F3d 691, 694 (II) (7th Cir. 2012) ("To prevail [on a claim that the evidence was insufficient to support a conviction, the defendant] must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt."); *United States v. Gaines*, 295 F3d 293, 299-300 (II) (2d Cir. 2002) ("To successfully challenge the sufficiency of the evidence underlying his conviction, [a] defendant bears the heavy burden of showing — when viewing the evidence in the light most favorable to the government, and drawing all inferences in favor of the prosecution — that no rational trier of fact could have found him guilty." (citation omitted)).

Here, Charles has not carried his burden to show that the trial evidence was constitutionally insufficient to support his convictions. Charles cites *Jackson*, asserts "that the State did not prove its charges beyond a reasonable doubt," and "asks th[is] Court to reverse" his convictions. However, he has not articulated why he

7

contends that the trial evidence was insufficient to support his convictions, much less formulated an argument showing that the trial evidence failed to prove an essential element of any crime charged beyond a reasonable doubt.[2] See *Willis v. State*, 315 Ga. 19, 23 (2) & n.3 (880 SE2d 158) (2022) (affirming a defendant's convictions where the defendant "contend[ed] that the evidence was not sufficient to sustain his convictions" and "cite[d] *Jackson v. Virginia*, [but] ma[de] no argument about the constitutional sufficiency of the evidence" (citation omitted)). See also *Davis*, 312 Ga. at 873 (1) (noting that "the jury's verdict will be upheld" unless "there is [no] competent evidence . . . to support [a] fact necessary to make out the State's case" (citation and punctuation omitted)). Accordingly, he has not carried his burden on appeal, and this claim fails. See *Davis*, 312 Ga. at 873 (1) n.2.

---

[2] The only argument that Charles makes at all is that "this Court reviews the sufficiency of the evidence *sua sponte*." (Emphasis in original.) That argument is incorrect. As explained in *Davenport v. State*, 309 Ga. 385 (846 SE2d 83) (2020), we "end[ed] our practice of sua sponte review of the constitutional sufficiency of the evidence supporting convictions in appeals of non-death penalty murder cases," starting with cases docketed to the December 2020 term of this Court. Id. at 386.

8

3. Charles argues that the trial court mishandled a potential issue of juror irregularity. The record shows that, following a 15-minute recess during Herbert's testimony, the victim's mother reported to a deputy that, during the break, a communication between her and Charles's mother had occurred in the restroom. Addressing counsel outside the presence of the jury, the court reported:

> I was advised just a moment ago, during the break, apparently there were some jurors in the ladies restroom. That the victim[']s mother was in the restroom and apparently the mother of one of the Defendant[ ]s. In which, the Court understands, the victim[']s mother said something to the — or the defendant's mother said something to the victim[']s mother, apologizing for this happening. Which the Court assumes the jury heard, those members of the jury who were in the restroom at the time, heard that conversation.

In response, Charles and Scoggins moved for a mistrial, arguing that any exposure to an apology was prejudicial because it could indicate guilt.

The court then asked the victim's mother to come forward and describe the conversation that had occurred in the restroom. She

9

stated that Charles's mother "just said that she was sorry and she wished it could have been her."  When asked if there was "any conversation about what may have happened," the victim's mother nodded her head "negatively."

The court then asked Charles's mother to come forward and describe the conversation she had with the victim's mother. Charles's mother said, "I just — she was crying and I just hugged her and told her that I was so sorry.  And if I could have took her daughter[']s place I would."  When asked if "[t]hat's the total extent of the conversation," Charles's mother stated, "That was it."  The court asked "[h]ow many jurors were in the restroom at the time," and Charles's mother responded, "I didn't know that there was any. I'm sorry.  I thought they had all walked out.  All I seen was her at the sink washing her hands, crying."

Charles's counsel argued that "[w]e need to find out how many jurors were in there" because what Charles's mother had said was "an indication of guilt."  The court stated that it did not believe the conversation caused prejudice warranting a mistrial because an

"[e]xpression of sympathy, in and of itself for something that happened to someone, is not an expression of admission of guilt by your client" and would not give rise to "an inference [by] . . . a juror that that person is admitting that a defendant committed the offense for which [he is] being charged."

The court then brought the jury back in, and the following exchange occurred:

> COURT: Members of the jury, the Court has been advised that there is the possibility that some members of the jury may have overheard a conversation during the break, involving people not on the jury. The Court is concerned that if that — if there was a conversation overheard, that it would have an impact on that juror or those jurors that may have heard a conversation, to the extent that it would adversely impact that juror[']s deliberations.
> I'm going to ask the jury as a whole, to whether there is any member of this jury, that heard any conversation, any matter that may be related to this case, to which you would be unable to totally disregard, forget about it, and it have no bearing on your decisions.
> If there is any member of the jury who cannot do that, if you would please indicate to the Court.
> ALL JURORS: No response.
> COURT: There is no member of the jury who indicated any conversation, if they overheard one, if the conversation was overheard, which would have any impact on their decision making process, so that they would not be able to totally disregard that remark. All

11

right.  Get your witness.

A bench conference immediately followed this exchange, during which Charles's counsel argued, "Your Honor, you asked if any conversation [occurred] that would impact the jurors, [but] I think the question is to ask[ ] if anybody overheard a conversation." The court responded that it had "included that [language].  I said, if there was any juror who overheard any conversation, if any, did that conversation have any impact."  The court then denied the defendants' motion for mistrial, stating, "I think the [c]ourt[']s instructions were appropriate."

We review a trial court's denial of a motion for mistrial for abuse of discretion, "and the trial court's exercise of [its] discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Mitchell v. State*, 315 Ga. 382, 388-389 (2) (882 SE2d 322) (2022) (citation and punctuation omitted).  When reviewing a trial court's "ultimate decision . . . for an abuse of discretion," we review factual findings or credibility determinations underlying the court's decision "only for clear error."

12

*Harris v. State*, 313 Ga. 872, 883 (5) (874 SE2d 73) (2022) (addressing the standard of review for evidentiary rulings). See also *Davis v. State*, 306 Ga. 430, 433 (831 SE2d 804) (2019) (reviewing "the trial court's factual findings and credibility determinations" for "clear error" and the court's ultimate denial of a motion to withdraw a guilty plea for "abuse of discretion"); *State v. Hill*, 295 Ga. 716, 718-719 (763 SE2d 675) (2014) (concluding that the trial court had abused its discretion in granting a new trial in part because the "court clearly erred in regard to material factual findings").

"To set aside a jury verdict solely because of irregular jury conduct, a court must conclude that the conduct was so prejudicial that the verdict is inherently lacking in due process." *Harris v. State*, 314 Ga. 51, 53 (2) (875 SE2d 649) (2022) (citation and punctuation omitted). "Any juror [irregularity] that has the potential to injure a defendant's due process rights triggers [a] presumption of prejudice," and "the prosecution [must then carry] the burden of establishing beyond a reasonable doubt that no harm occurred." Id. at 53-54 (2) (citations and punctuation omitted). "To

establish that the juror [irregularity] was harmless beyond a reasonable doubt, the State must show based on the record evidence that there is no reasonable possibility that the juror [irregularity] contributed to the conviction." Id. at 54 (2) (citation and punctuation omitted). As we have explained, "the State may carry this burden by establishing that the juror [irregularity] was an immaterial irregularity without opportunity for injury." *Mitchell*, 315 Ga. at 389 (2) (citation and punctuation omitted).

On appeal, Charles argues that "the trial court abused its discretion in failing to inquire more specifically whether any jurors overheard the conversation and what impact it might have had on them." According to Charles, "the trial court offered a blanket instruction and asked if jurors could follow it" without determining "whether any of [the jurors] heard the conversation and what particular things they heard." Charles further argues that, if jurors overheard the conversation, they could have inferred from the apology and expression of remorse that Charles's mother believed Charles had killed the victim.

Charles is correct that the wording of the court's yes-or-no question appears to have impaired the court's ability to determine whether any juror overheard the restroom conversation and thus whether any juror irregularity might have occurred. The court's question to the jurors was compound, asking them both whether they had overheard a conversation related to the case and whether they could disregard such a conversation. As a result, the jurors' lack of a response to the question might have indicated either that the jurors *had not* overheard the conversation in the restroom or that they *had* overheard the conversation but believed they could disregard what they heard.

Nevertheless, under the circumstances, the court did not abuse its discretion by failing to determine whether jurors were exposed to the extra-judicial conversation between Charles's mother and the victim's mother. Through its questioning of the two mothers, the court established that "the total extent" of the conversation in the restroom was limited to Charles's mother stating that she "was so sorry" for the victim's mother's loss and that Charles's mother would

15

have traded "place[s]" with the victim if she could. The victim's mother further confirmed that there was no discussion of "what may have happened" to the victim. Based on the record, we cannot say that the trial court clearly erred in finding that the extra-judicial statements were mere "[e]xpression[s] of sympathy" for what had happened to the victim, as opposed to an apology for any role Charles may have played in the victim's death, and that the expressions of sympathy did not give rise to an inference that Charles's mother believed Charles had "committed the offense[s] for which [he was] being charged." It follows that any juror irregularity that might have occurred "was an immaterial irregularity without opportunity for injury" and thus that the record "establish[ed] beyond a reasonable doubt that no harm occurred." *Mitchell*, 315 Ga. at 389 (2) (citations and punctuation omitted). Accordingly, the trial court did not abuse its discretion in denying Charles's motion for mistrial. See id.

4. Charles argues that the trial court erred in denying his pretrial motion to bifurcate the trial and try separately the charges

16

for which his status as a felon was material (the felon-in-possession-of-a-firearm charges and felony-murder charge predicated on the felon-in-possession-of-a-firearm charges) and the remaining charges for which he was convicted (malice murder, theft by taking, conspiracy to commit arson in the second degree, and possession of a firearm during the commission of a felony). According to Charles, the court's ruling violated his due process rights under the Fourteenth Amendment to the United States Constitution because introducing "highly prejudicial" evidence of his prior felony convictions "relieve[d] the State of its burden to prove the charges through the facts of the case rather than through [his] bad character." We disagree.

In *Head v. State*, 253 Ga. 429 (322 SE2d 228) (1984), overruled in part on other grounds by *Ross v. State*, 279 Ga. 365 (614 SE2d 31) (2005), this Court provided guidance for when trial courts should grant a motion to bifurcate trial on a charge of possession of a firearm by a convicted felon and a more serious charge to "protect the rights of the accused" under the Due Process Clause of the

17

Fourteenth Amendment. Id. at 431 (3). If a felon-in-possession-of-a-firearm charge and a more serious charge are "unrelated," we explained, the trial court must grant a motion to bifurcate trial on the two charges to avoid the possibility that the jury will be "unduly influenced by evidence of [the defendant's] prior criminal record." Id. at 431-432 (2), (3) (a). But a different rule applies if the felon-in-possession-of-a-firearm charge "might be material to a more serious charge," as in a case where "the possession charge might conceivably become the underlying felony to support a felony murder conviction on the malice murder count of the indictment." Id. at 432 (3) (d). In such a case, the trial court should deny the motion to bifurcate and "instruct the jury that . . . they are permitted to receive evidence of prior convictions" only for the purpose of deciding whether the defendant is guilty of "the charge of possession" and any "lesser included offense" of "the more serious charge" for which "such evidence might be material." Id. This Court has further held that a trial court does not err in denying a motion to bifurcate a felony-murder count from the rest of a defendant's trial, where the felony-

18

murder count is predicated on a felon-in-possession-of-a-firearm charge and the defendant is charged with both felony murder and malice murder of the same victim. See *Tabor v. State*, 315 Ga. 240, 247 (2) (a) (882 SE2d 329) (2022) ("[A] trial court does not err in refusing to bifurcate the charge of possession of a firearm . . . where, as here, the possession charge was an underlying felony to a murder count of the indictment. . . . And, to the extent [that the defendant] contends that the trial court should have also bifurcated the felony murder count from the rest of his trial [for malice murder and other offenses], this claim also fails." (citations and punctuation omitted)).

Here, the trial court abided by this Court's guidance in *Head* and its progeny. Because felon-in-possession-of-a-firearm charges served as "the underlying felon[ies] to support a felony murder conviction," they were "material to a more serious charge," and *Head* required that the court deny the motion to bifurcate. *Head*, 253 Ga. at 432 (3) (d). See also *Tabor*, 315 Ga. at 247 (2) (a).

Further, the trial court faithfully complied with *Head*'s

19

directive that a court denying a motion to bifurcate under such circumstances "instruct the jury that . . . they are permitted to receive evidence of prior convictions" for the limited purpose of deciding whether the defendant was guilty of charges for which "such evidence might be material." *Head*, 253 Ga. at 432 (3) (d). Specifically, when the State admitted certified copies of the defendants' convictions at trial, the court told the jurors that "you may consider this evidence only in so far as it may relate to the required element of a conviction of a felony, for the offenses as alleged in the Indictment, in Counts 3, 4, 6, 7, 8 and 9, and not for any other Count or any other purpose."[3] During its jury charge, the court gave the same instruction again.

Charles contends that we should reconsider the rule announced in *Head* — that a felon-in-possession-of-a-firearm charge should not be bifurcated when it is material to a more serious charge

---

[3] Counts 3 and 4 charged Charles and Scoggins, respectively, with felony murder predicated on possession of a firearm by a convicted felon. Counts 6 and 7 charged Charles with being a felon in possession of a firearm, and Counts 8 and 9 charged Scoggins with being a felon in possession of a firearm.

— because the jury's consideration of a defendant's felony status "incurably injects bad character evidence into the jury's consideration." However, Charles has failed to explain why giving a limiting instruction in accordance with *Head*'s directive did not cure any prejudice that might have arisen from admission of his prior convictions. The trial court gave *two* limiting instructions — both of which directed the jury not to consider evidence of Charles's prior convictions when deciding the charges for which his status as a felon was not material — and "the jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary." See *Ash v. State*, 312 Ga. 771, 781 (2) (865 SE2d 150) (2021). Accordingly, this enumeration of error fails.[4]

---

[4] Charles also argues that permitting the State to "us[e] possession of a firearm by a convicted felon as the underlying felony in [his] felony murder count," and allowing the State to try together counts of being a felon in possession of a firearm and felony murder, violated his due process rights. This is so, Charles argues, because using a felon-in-possession charge as a predicate for felony murder "inextricably link[ed] [his] felon[ ] status under the possession count to the felony murder charge" and thereby required the jury to consider prejudicial character evidence when determining whether he was guilty of felony murder. These arguments focus only on how the felon-in-possession counts affected the related felony-murder count, not on any broader effect that the felon-in-possession counts had on the jury's consideration of the

5. Finally, Charles argues that trial counsel was ineffective for failing to "object to the use of possession of a firearm by a convicted felon as the underlying offense for felony murder" because including the felon-in-possession charges as predicate offenses for felony murder violated his "Fourteenth Amendment right to a fair trial" on the felony-murder count, and because, when testifying at the motion-for-new-trial hearing, trial counsel provided "no reason or explanation for his failure to object." This claim is moot, however, because Charles's convictions for felony murder were vacated by operation of law. See *Powell v. State*, 291 Ga. 743, 749 (3) (733 SE2d 294) (2012) (holding that an ineffective-assistance-of-counsel claim based on counsel's failure to object to an alleged constructive amendment of an indictment charging felony murder and aggravated assault was moot "because the convictions for felony

---

charges as a whole. However, these arguments are moot because, after Charles was convicted of malice murder, the felony-murder count premised on being a felon in possession of a firearm was vacated by operation of law. See *Johnson v. State*, 313 Ga. 698, 699 n.2 (873 SE2d 123) (2022) ("Because the felony murder count was vacated by operation of law, [the defendant's] contention as to this offense is moot.").

22

murder and aggravated assault were either vacated by operation of law or merged into the malice murder conviction").

*Judgment affirmed. All the Justices concur.*

Decided February 21, 2023.

Murder. Gordon Superior Court. Before Judge Watkins.

*Robert C. Rutledge*, for appellant.

*Samir J. Patel, District Attorney, Whitney A. Law, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.

23