NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 2, 2023

S23A0022, S23A0023.  SESSION v. THE STATE.

PETERSON, Presiding Justice.

In these companion appeals, Derrick Session challenges his convictions for failure to register as a sex offender in Georgia based on a conviction he received in Louisiana. He argues that the evidence was insufficient to support his Georgia convictions. He also argues that the Georgia registration statute as applied to him violates his federal rights to travel and equal protection, and he raises a facial challenge to the registration statute under the Georgia constitutional prohibition against legislation regarding the social status of citizens.

After thorough consideration, we reject those arguments. First, Session has not shown that the evidence was insufficient to support his convictions, because he has conceded that the only argument as

to sufficiency that he made in his primary appellate brief — that the convictions violated ex post facto principles — is at odds with controlling case law. Next, his arguments that the registration statute violated his federal rights to travel and to equal protection fail because they are based on the unduly speculative assumption that if he had committed the underlying sexual offense in Georgia, he would have been convicted of only a misdemeanor and thus not subject to registration. And finally, although Session makes an interesting argument that Georgia's constitutional prohibition against legislation regarding citizens' social status must mean something different than the repugnantly racist — and patently unconstitutional — meaning that this Court ascribed to it shortly after its first adoption in 1868, he has not shown that any different meaning that provision has today is inconsistent with the requirements of the Georgia sexual offender registry. We therefore affirm.

1. *Background.*

Viewed in the light most favorable to the verdicts, the evidence

admitted at trial — much of which came from Louisiana court documents or stipulated facts — was as follows. In May 1994, Session was indicted in Louisiana for the aggravated rape of a four-year-old child. Session was 15 years old at the time of the alleged offense. On May 18, 1995, Session entered a plea of guilty to an amended charge of sexual battery. The Louisiana trial court accepted that plea and, at a hearing on August 15, 1995, sentenced Session to ten years to serve at hard labor. In 2004, after completing his sentence, Session received a first-offender pardon pursuant to Louisiana R.S. 15:572.

At some point, Session moved to Texas. Session later moved to Paulding County and registered on the Georgia sex offender registry ("the Registry") with the Paulding County Sheriff's Office in April 2017. In March 2019, a detective conducted a residence check at a Dallas, Georgia, address that Session had provided to the Paulding County Sheriff's Office, and was told that Session was not living there. Session, who was living in Kennesaw at the time, was arrested for failure to register. He appeared at the Paulding County

3

Sheriff's Office in March 2020 to update his registration; he apparently was arrested while completing his paperwork.

On October 28, 2020, a Paulding County grand jury returned two separate indictments against Session, each charging him with two counts of failure to register as a sex offender under OCGA § 42-1-12, with one indictment alleging violations in March 2019 and the other alleging violations in February and/or March 2020. Session filed an identical general demurrer and plea in bar in each case. In those filings, Session demurred generally to all counts in the indictments as failing to charge him with a crime and argued that his prior first-offender pardon barred the Paulding County prosecution.[1] He also "demur[red] to the Registry as-applied to his case" on three federal constitutional grounds. First, he argued that the Registry violated his fundamental right to travel under the Privileges and Immunities Clause by treating him worse than a native Georgian, because the conduct that was the basis for his

_____

[1] On appeal, Session does not rely on the first-offender pardon received from Louisiana in seeking reversal of his Georgia convictions.

4

underlying offense would have constituted a misdemeanor not subject to registration if committed in Georgia. Second, he argued that the application of the Registry to him violated the Equal Protection Clause by distinguishing between in-state and out-of-state convictions. Third, he argued that his due process rights had been violated by lack of notice that he would have to register, given that he was a minor at the time of the offense, was convicted of something that would be a misdemeanor in Georgia, and was pardoned by Louisiana. Apart from his as-applied federal constitutional challenges, Session also raised facial and as-applied challenges to the Registry under Paragraph XXV of the Georgia Bill of Rights, which provides, "The social status of a citizen shall never be the subject of legislation." Ga. Const. of 1983, Art. I, Sec. I, Par. XXV.

The case proceeded to a bench trial of both cases in July 2022; the trial court received both stipulated facts and evidence. In his closing argument, Session argued that OCGA § 42-1-12 violated the United States Constitution, as applied to him, and the Georgia

5

Constitution, both facially and as applied. The trial court orally denied Session's demurrer and plea in bar in each case and adjudicated him guilty on all counts (except for one count that the State nolle prossed). The court imposed an aggregate sentence of 20 years, to serve five in confinement, with the incarceration time to be suspended, conditioned upon Session paying $6,000 in fines within six months and fully complying with the registration requirements of the sex offender statute. Session filed timely notices of appeal.

2.     *Session has not shown that the evidence is insufficient to support his convictions.*

Because "[w]e do not unnecessarily decide the constitutionality of statutes," *In the Interest of C.C.*, 314 Ga.446, 451 (2) (a) (877 SE2d 555) (2022), we consider first Session's argument that the evidence was insufficient to support his convictions. We conclude that Session has not shown that the evidence was insufficient to support his convictions.

When evaluating the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

6

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979) (emphasis omitted).

> Similar to appeals from a jury trial resulting in a criminal conviction, on appeal from a bench trial, we view all evidence in the light most favorable to the trial court's verdict, and the defendant no longer enjoys the presumption of innocence. We do not re-weigh testimony, determine witness credibility, or address assertions of conflicting evidence.

*Jones v. State*, 307 Ga. 505, 506 (1) (837 SE2d 288) (2019) (citation and punctuation omitted). "On appeal, it is the defendant's burden to show that the trial evidence was insufficient as a matter of constitutional due process to support his convictions." *Charles v. State*, 315 Ga. 651, 653 (2) (884 SE2d 363) (2023); see also *Davis v. State*, 312 Ga. 870, 873 (1) n.2 (866 SE2d 390) (2021) (affirming a defendant's convictions where his "only" sufficiency argument lacked merit and he "ha[d] not otherwise shown that the evidence supporting the child cruelty convictions was insufficient as a matter of constitutional due process").

[T]he provisions of OCGA § 42-1-12 require that

convicted sex offenders falling within its purview provide a substantial amount of personal information, including name, social security number, age, detailed physical description, fingerprints, photograph, date and place of employment, and vehicle identification, to the sheriff of the county of his residence. OCGA § 42-1-12 (a) (16); (f) (2). After initially registering in person, the offender must renew registration in person once a year, OCGA § 42-1-12 (f) (4), and update the sheriff within 72 hours of any change to the required information. OCGA § 42-1-12 (f) (5). These requirements must be complied with until death, except for periods of subsequent incarceration. OCGA § 42-1-12 (f) (6). This information is maintained and made accessible to the public by the Georgia Bureau of Investigation and the relevant county sheriff, OCGA § 42-1-12 (h), (i), and submitted to "each school in this state." OCGA § 42-1-12 (l). And violation of the requirements of this Code section constitutes a felony punishable by up to 30 years imprisonment. OCGA § 42-1-12 (n) (1).

*State v. Davis*, 303 Ga. 684, 690 (2) (814 SE2d 701) (2018).

The State in this case charged Session with failing to register in violation of OCGA § 42-1-12 (n). The indictments of Session alleged that he was required to register "pursuant to the provisions of OCGA 42-1-12 (e) by virtue of having previously been convicted of the offense of Sexual Battery on August 15, 1995 in the Parish of Franklin, Louisiana, said offense being a criminal offense against a victim who is a minor and having been placed on supervised release

8

on August 15, 1995[.]" OCGA § 42-1-12 (e) lists several categories of persons for whom registration is required. The State provides two alternative bases on which Session was required to register: the registration requirement for any individual who "[h]as previously been convicted of a criminal offense against a victim who is a minor and may be released from prison or placed on parole, supervised release, or probation on or after July 1, 1996[,]" OCGA § 42-1-12 (e) (3), and the registration requirement for any individual who "is a nonresident who changes residence from another state . . . to Georgia who is required to register as a sexual offender under the laws of another state or territory[,]" OCGA § 42-1-12 (e) (6). Whether or not the evidence supports a conclusion that Session was required to register pursuant to OCGA § 42-1-12 (e) (3), we conclude that Session has not shown that the evidence was insufficient to support a conclusion that he was required to register pursuant to OCGA § 42-1-12 (e) (6).

Louisiana law requires (and required at the time that Session allegedly failed to register in Georgia, as well as at the time of

9

Session's underlying offense) registration by any adult residing in the state who had been convicted of a "sex offense." La. R.S. 15:542 (A) (1) (a); La. R.S. 15:542 (A) (1992). The statute explicitly defines "sex offense" as including the crime of sexual battery, and it did so at the time that Session allegedly failed to register in Georgia. See La. R.S. 15:541 (24) (a) (2018). The crime of sexual battery also fell within the Louisiana registration statute's definition of a "sex offense" at the time of the underlying crime and at the time of sentencing for sexual battery in Louisiana. See La. R.S. 15:542 (E) (1995); La. R.S. 15:544 (E) (1992). At the time of Session's underlying offense, as well as when he was sentenced for sexual battery, the Louisiana registration statute required those subject to the statute to register for ten years after their release from prison. See La. R.S. 15:544 (A) (1995); La. R.S. 15:544 (A) (1992). The Louisiana legislature in 2007 extended that requirement to 15 years, with a 25-year registration requirement for those "convicted of a sexual offense of a victim who is a minor" and a lifetime registration requirement for certain other offenders. See 2007 La.

10

Acts, No. 460, § 2 (effective Jan. 1, 2008). Under this amendment, sexual battery was (and is) generally included in the definition of "sexual offense against a victim who is a minor" when the victim is under the age of 18. See id.; see also La. R.S. 15:541 (25) (a). The State takes the position here that because Louisiana required Session to register for 25 years, he thus has been required to register in Louisiana (were he to move back to that state) since the time that he moved to Georgia, and so he has been required to register in Georgia pursuant to OCGA § 42-1-12 (e) (6).

On appeal, Session argues that he was not required to register pursuant to OCGA § 42-1-12 (e) (6) because extending his Louisiana registration requirement via an enactment after the commission of his underlying offense would constitute an impermissible ex post facto law. But the Louisiana Supreme Court has rejected the notion that lengthening a registrant's registration period violates ex post facto principles as a matter of both federal and Louisiana constitutional law, at least where the change was made during the registrant's original reporting period. See *Smith v. State*, 84 S3d

11

487, 497-499 (La. 2012); see also *State v. Clark*, 117 S3d 1246, 1248 (La. 2013) (noting Section 6 of 2007 La. Acts 460 specifically provided that "[t]he provisions of this Act shall apply to all persons convicted of a sex offense or a criminal offense against a victim who is a minor . . . regardless of the date of conviction, with the exception of those persons required to register under previous provisions of law whose obligations to register have been fulfilled and extinguished by operation of law"). This is consistent with similar rulings by this Court and the United States Supreme Court. See *Smith v. Doe*, 538 U.S. 84, 105-106 (123 SCt 1140, 155 LE2d 164) (2003) (statutory requirement for retroactive registration of sex offenders was "nonpunitive" and did not itself constitute an ex post facto law); *Frazier v. State*, 284 Ga. 638, 640 (1) (668 SE2d 646) (2008) (rejecting argument that sexual offender registration requirement in conjunction with criminal penalty provision enacted after appellant's underlying conviction violates state and federal prohibitions of ex post facto laws). Session's counsel conceded at oral argument that Session's ex post facto argument cannot succeed.

Except to say that he could not *alternatively* be required to register in Georgia by virtue of a requirement that he register in *Texas*, this ex post facto argument about the Louisiana statutory change was the only argument that Session raised in his primary appellate brief as to why the State had not shown that he was required to register under OCGA § 42-1-12 (e) (6). And the only argument that Session made as to why the evidence was insufficient to support his failure-to-register convictions was that the State had not shown that he was required to register under either OCGA § 42-1-12 (e) (3) or OCGA § 42-1-12 (e) (6).

At oral argument before this Court, Session tried to pivot to an argument different from that which he made in his brief, arguing that the State had not presented sufficient evidence that he was still required to register in Louisiana when he moved to Georgia, even assuming that the 2007 legislative change could apply to him consistent with ex post facto principles. Session expounds on that argument in a supplemental brief filed after oral argument. But this argument is nowhere contained in Session's primary brief before

this Court. And "[i]t is improper to use a supplemental brief to expand upon the issues to be decided by this Court." *Saint v. Williams*, 287 Ga. 746, 747 (2) (699 SE2d 312) (2010).

And even if the tack that Session took at oral argument and the brief that followed is theoretically within the bounds of the (rather broad) enumeration of error stated in his brief — "The Trial Court Erred in Convicting Session because the Registry Statute did not Apply to Him" — it is not reasonably so. The argument Session made at oral argument as to why the State had not proven that he was required to register under OCGA § 42-1-12 (e) (6) raises at least one question (whether his Louisiana conviction constitutes a "sexual offense against a victim who is a minor" triggering Louisiana's 25-year registration term) that is nowhere addressed in Session's primary appellate brief. We require appellants to file a principal brief by a certain date, and we dismiss appeals of appellants who fail to file briefs. See Supreme Court Rule 10. And we require all enumerated errors to be supported by argument or citation of authority; otherwise, the enumeration will be deemed abandoned.

14

See Supreme Court Rule 22.

Here, Session timely filed a brief containing enumerations of error supported by argument and citation of authorities. But his brief contained no argument or citation of authority in support of the argument that he makes now. To consider this completely different issue, raised at oral argument for the first time, would render our rules a dead letter, and we will not allow that. Cf. *Cox v. U.S. Markets, Inc.*, 278 Ga. App. 287, 291 (4) (628 SE2d 701) (2006) ("One cannot expand the scope of review or supply additional issues through a process of switching, shifting, and mending your hold." (citation and punctuation omitted)).[2] Having conceded the only basis on which he made a claim supported by argument and citation of authority in his primary appellate brief as to why he did not need to register pursuant to OCGA § 42-1-12 (e) (6), Session has not shown that the evidence was insufficient to support his Georgia convictions.

---

[2] Apparently, the phrase "mend the hold" is a nineteenth-century wrestling term, meaning to get a better grip on one's opponent. See *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F2d 357, 362 (7th Cir. 1990).

3. *Session has not shown that requiring him to register violates his federal rights to travel and equal protection.*

Session raises two federal constitutional arguments, arguing that applying the registration requirement to him violates his right to travel and his equal protection rights. We conclude that Session has not shown a violation of these federal rights.

(a) *Right to travel.*

The Privileges and Immunities Clause of the Fourteenth Amendment protects the right to travel, which includes "the right of a citizen of one State to enter and leave another State . . . , and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500-504 (119 SCt 1518, 143 LE2d 689) (1999).

Session argues that requiring him to register violates his right to travel because he is being treated differently than he would be had the underlying crime in question been committed in Georgia, as he would not have been required to register had he been convicted of sexual battery in Georgia. The Registry statute exempts "a conviction for a misdemeanor" from the definition of "a criminal

16

offense against a victim who is a minor." OCGA § 42-1-12 (a) (9) (C). The Louisiana offense of which Session was convicted, sexual battery, is a felony. See La. R.S. 14:43.1 (C) (1991); see also La. R.S. 14:2 (4) (1992) (defining "felony" as "any crime for which an offender may be sentenced to death or imprisonment at hard labor"). But at the time that Session committed his underlying offense in Louisiana, Georgia treated sexual battery as a misdemeanor. See OCGA § 16-6-22.1 (c) (1990).[3]

None of the United States Supreme Court decisions on which Session relies for his right-to-travel claim involved an argument that a new state resident's right to travel is being burdened by a sex offender registration requirement on the basis that, if he had committed the crime in his new state, he would have been treated differently *in the underlying criminal case,* and thereby not be required to register. Rather, these cases involved public benefits schemes that allocated benefits differently depending on how long a

---

[3] Today, by contrast, the statute provides that a person convicted of the offense of sexual battery of a child under the age of 16 years is guilty of a felony. See OCGA § 16-6-22.1 (d).

17

person had been residing in the state. See *Saenz*, 526 U.S. at 500-507 (state statute limiting welfare benefits through recipient's first year of residency to the amount payable by the State of the recipient's prior residence violated Fourteenth Amendment right to travel); *Hooper v. Bernalilo County Assessor*, 472 U.S. 612, 618 n.6, 622-623 (105 SCt 2862, 86 LE2d 487) (1985) (applying equal-protection analysis to conclude that state statute that granted tax exemption limited to those Vietnam veterans who resided in the state before a certain date violated newer residents' right to travel); see also *Williams v. Vermont*, 472 U.S. 14, 27 (105 SCt 2465, 86 LE2d 11) (1985) (finding it unnecessary to consider appellants' arguments based on right to travel).

Here, the Registry does distinguish between "residents" and "nonresidents." See OCGA § 42-1-12 (e). It treats persons with foreign convictions differently depending on whether the convict is a Georgia resident, a new resident, or a nonresident who enters the state for significant periods of time for employment, schooling, or other purposes. See id. In particular, the statute requires

18

registration by those convicted of certain crimes on or after July 1, 1996, or those who are convicted of such crimes and who "may be released from prison or placed on parole, supervised release, or probation on or after July 1, 1996." OCGA § 42-1-12 (e) (1)-(4). A resident of Georgia convicted of certain crimes under the laws of another jurisdiction on or after certain dates is required to register. See OCGA § 42-1-12 (e) (5). On the other hand, a nonresident who moves to Georgia who is required to register in another jurisdiction, as well as "a nonresident sexual offender" who visits the state for certain purposes for certain lengths of time, may be required to register, irrespective of when the underlying conviction was entered, or when the person was released or placed on parole, supervised release, or probation. See OCGA § 42-1-12 (e) (6)-(8).[4]

---

[4] The statute requires registration by a resident of Georgia "who intends to reside in this state" if that person "is convicted under the laws of another state or the United States, under the Uniform Code of Military Justice, or in a tribal court of a sexually violent offense, a criminal offense against a victim who is a minor on or after July 1, 1999, or a dangerous sexual offense on or after July 1, 1996[.]" OCGA § 42-1-12 (e) (5). For a nonresident who moves to Georgia, registration is required if the person "is required to register as a sexual offender under federal law, military law, tribal law, or the laws of another state or territory or who has been convicted in this state of a criminal

19

But Session does not ground his right-to-travel claim in the Registry's different treatment of residents, new residents, and nonresidents generally. His as-applied right-to-travel challenge to the statute is very specific to him. He claims that "the Registry imposes disabilities on Session for a conviction that, if occurring simultaneously in Georgia, would not require registration[,]" with "[t]he only reason for the differential treatment" being that "Louisiana punished Session for a felony, even though the same crime in Georgia at the time was only a high and aggravated misdemeanor." This, Session argues, quoting a separate writing in *Hope v. Comm'r of Ind. Dept. of Corr.*, 9 F4th 513 (7th Cir. 2021) (en banc), amounts to "assign[ing] different obligations to Georgians 'based not on what they have done but where they have been. It is relying on another state's handling of a particular criminal history

_____

offense against a victim who is a minor or any dangerous sexual offense." OCGA § 42-1-12 (e) (6). Nonresidents who enter the state for schooling or some purpose such as employment for a period exceeding 14 consecutive days or an aggregate of 30 days during any calendar year must register if they fit the definition of a "sexual offender" — defined as anyone who "is convicted of a criminal offense against a victim who is a minor or any dangerous sexual offense" or who is otherwise required to register under the statute. OCGA § 42-1-12 (a) (20), (e) (7)-(8).

20

to determine how that individual will be treated in' Georgia." Id. at 536 (Rovner, J., concurring in part and dissenting in part).

But this argument depends on the highly speculative assumption that if Session had engaged in the underlying conduct in Georgia, he would be have been convicted of a mere misdemeanor and thus not required to register. The Louisiana sexual battery crime of which Session was convicted and the Georgia crime of sexual battery that existed in 1994 are not identical. The Louisiana sexual battery statute under which Session was convicted defined the offense as follows:

> Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender:
>
> (1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
>
> (2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.

La. R.S. 14:43.1 (A) (1991). At the time of Session's Louisiana

offense, Georgia's crime of sexual battery was defined as "intentionally mak[ing] physical contact with the intimate body parts of the body of another person without the consent of that person." OCGA § 16-6-22.1 (b). Perhaps most notably, the range of body parts the touching of which could bring an action within the ambit of the offense was broader in the Georgia offense; the Georgia statute defined "intimate parts" as "the primary genital area, anus, groin, inner thighs, or buttocks of a male or female and the breasts of a female." OCGA § 16-6-22.1 (a) (1990).[5]

But apart from any particular differences, it is pure speculation to say of what particular crime Session would have been convicted, let alone to say that it would have been a misdemeanor, had he engaged in the same conduct in Georgia. Session's argument assumes that, notwithstanding the differences in the elements and punishment accompanying the Louisiana and Georgia sexual battery offenses at the time, a Georgia prosecutor would have offered

---

[5] These definitions remain the same under the current Code. See OCGA § 16-6-22.1.

a plea deal in which Session would have pleaded guilty to a misdemeanor sexual battery offense, and the trial court would have accepted such a bargain. The limited factual record regarding the underlying crime makes engaging in such speculation particularly difficult. And such a speculative argument is not nearly as strong as the argument *rejected* by the Seventh Circuit sitting en banc in *Hope*; in that case, all of the plaintiffs committed their crimes before Indiana enacted its registration statute, such that registration for *any* in-state offense was prohibited under the Indiana Supreme Court's interpretation of the state's own ex post facto clause. See 9 F4th at 522, 525-526; see also *Hope*, 9 F4th at 538 (Rovner, J., concurring in part and dissenting in part). It is also no stronger than other right-to-travel challenges to other sex offender statutes that appellate courts have rejected. See *Doe v. Peterson*, 43 F4th 838, 841-842 (8th Cir. 2022) (rejecting federal right-to-travel challenge to Nebraska sex offender law that required registration by those obligated to register in another state, even if the offense was committed as a juvenile, but did not require registration for those

23

who committed offenses in Nebraska as juveniles); *State v. Yeoman*, 236 P3d 1265, 1268-1269 (Idaho 2010) (rejecting federal right-to-travel challenge to Idaho sex offender statute that required registration for out-of-state convictions regardless of when they occurred, but only those in-state convictions that occurred after a certain date, given that registration based on out-of-state convictions also depended upon being required to register in the state of conviction at the time of relocation to Idaho).[6] Session has not shown that requiring him to register violated his right to travel under the federal Constitution.

(b)  *Equal protection.*

Similarly, Session's equal-protection argument is based on the assumption that if he had committed the same underlying offense in

---

[6] We observe that the Idaho Supreme Court has reversed on federal right-to-travel grounds a conviction under a prior Idaho sex offender registration law that provided that a longer-term resident with a pre-1993 conviction from Idaho or elsewhere did not have to register, while a person with such a conviction who moved to Idaho after June 1993 was required to do so, no matter how old the conviction. See *State v. Dickerson*, 129 P3d 1263, 1266-1271 (Idaho 2006). Nothing in the Georgia registry statute makes such a distinction, and the sort of distinctions between residents and non-residents discussed above are, again, not the basis for Session's argument.

Georgia, he would have been convicted of only a misdemeanor.

"[A]n equal protection challenge to a criminal statute is examined under the rational basis test unless the statute discriminates on racial grounds or against a suspect class." *State v. Holland*, 308 Ga. 412, 415 (2) (841 SE2d 723) (2020). "An equal protection claimant must establish that he is similarly situated to members of the class who are treated differently from him" and that "there is no rational basis for such different treatment." Id. at 415-416 (2) (citation and punctuation omitted). "In general, for equal protection purposes, criminal defendants are similarly situated if they are charged with the same crime." Id. at 416 (2) (citation, punctuation, and emphasis omitted).

Session argues that requiring him to register based on his Louisiana conviction violates his right to equal protection because such a requirement distinguishes between persons with a foreign sexual battery conviction and similarly-situated persons convicted of sexual battery in Georgia, a distinction that he contends is not rationally related to achieving the Registry's (admittedly) legitimate

25

purposes. But, as discussed above, Georgia's definition of the crime of sexual battery was similar to, but not the same as, Louisiana's definition at the time of the underlying offense. And to the extent that the underlying substantive Georgia criminal law treats certain conduct differently than another state does, this is not the sort of explicit distinction between in-state and out-of-state offenders by a sex offender registry scheme that other courts have found runs afoul of the Equal Protection Clause. Compare *Doe v. Pa. Bd. of Probation & Parole*, 513 F3d 95, 98, 112 (3d Cir. 2008) (equal protection violation where state law automatically subjected out-of-state sex offenders to community notification, while an individual convicted of same offense in Pennsylvania would be subject to notification only if particular designation were made after a civil hearing); *ACLU of N.M. v. City of Albuquerque*, 137 P3d 1215, 1226-1227 (N.M. Ct. App. 2006) (equal protection violation where city's sex offender law required registration for those with out-of-state convictions who were in city only three consecutive days, but not for those with in-state convictions who were in the city much more often); and

26

*Hendricks v. Jones ex rel. State*, 349 P3d 531, 536 (Okla. 2013) (equal protection violation where state's registration requirement applied to out-of-state offenders convicted prior to statue's enactment, but limiting registration for in-state offenders to those whose conviction occurred after statute's effective date); with *Morales-Frometa v. Attorney General United States*, 812 Fed. Appx. 95, 99 (3d Cir. 2020) ("courts have repeatedly recognized the equal protection does not require uniformity" among jurisdictions); *United States v. Titley*, 770 F3d 1357, 1362 (10th Cir. 2014) (rejecting equal protection challenge to Armed Career Criminal Act designation based on two state drug convictions that the appellant argued "would not qualify had the predicate offenses been committed in 19 other states or the District of Columbia"); *United States v. Fink*, 499 F3d 81, 87 (1st Cir. 2007) (rejecting claim that statutory enhancement dependent upon states' variable treatment of drug possession violated right to equal protection). Session has not shown that requiring him to register in Georgia violated his federal equal protection rights.

4. *Session has not shown that the Georgia Registry violates*

*the Georgia Constitution's Social Status Provision.*

Finally, Session argues that the Georgia Registry is unconstitutional on its face because it violates the Georgia Constitution's Social Status Provision. We reject this claim.

As noted above, Paragraph XXV of the Georgia Bill of Rights provides that "[t]he social status of a citizen shall never be the subject of legislation." Ga. Const. of 1983, Art. I, Sec. I, Par. XXV (the "Provision"). This Provision has been construed only rarely by Georgia's appellate courts, and most of those cases have involved the patently racist applications of the Provision in the decades following its adoption into the Georgia Constitution in 1868. In those cases, we apparently held that the Provision prohibited any attempts by the General Assembly to remove barriers to racial integration. Session argues that the Provision cannot have that meaning anymore, that it nevertheless must still have some meaning, and thus this provision now "prohibits the State from creating favored or disfavored classes of citizens." He argues that the Registry therefore violates this Provision because it "serves to create a lower-

28

tier citizen[.]" As we explain below, regardless of whether Session is correct that the Provision must mean something different than the meaning this Court initially ascribed to it, his claim ultimately fails because he has offered no proposed meaning of the Provision that forecloses requiring him to register.

Session's burden on this claim is a difficult one.

> We presume that statutes are constitutional, and before an act of the General Assembly can be declared unconstitutional, the conflict between it and the fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Because all presumptions are in favor of the constitutionality of a statute, the burden is on the party claiming that is the law is unconstitutional to prove it. And [Session]'s task is made all the more difficult because, to make this argument, [he] is asserting a novel and quite expansive construction of a provision of the Georgia Constitution that has received little attention since it was enacted.

*Ammons v. State,* 315 Ga. 149, 163 (3) (880 SE3d 544) (2022) (citations and punctuation omitted).

It is well established that "we interpret the Georgia Constitution according to its original public meaning." *Elliott v. State,* 305 Ga. 179, 181 (II) (824 SE2d 265) (2019). "And, of course,

the Georgia Constitution that we interpret today is the Constitution of 1983; the original public meaning of that Constitution is the public meaning that it had at the time of its ratification in 1982." Id. And when a provision has been "retained from a previous constitution without material change," we generally presume that the provision "has retained the original public meaning that provision had at the time it first entered a Georgia Constitution, absent some indication to the contrary." Id. at 183 (II) (A). In addition, "[a] constitutional clause that is readopted into a new constitution and that has received a consistent and definitive construction is presumed to carry the same meaning as that consistent construction." Id. at 184 (II) (B).

The Provision first entered the Georgia Constitution in 1868, part of the new constitution ratified by Georgians to satisfy the conditions set by Congress for readmission to the Union. See Ga. Const. of 1868, Art. I, Sec. XI ("The social status of the citizen shall never be the subject of legislation."); see also *Ammons*, 315 Ga. at 164-165 (3) (discussing context of ratification of 1868 Constitution).

30

That text has remained materially unchanged since its adoption. See Ga. Const. of 1983, Art. I, Sec. I, Par. XXV (changing "the citizen" to "a citizen"); Ga. Const. of 1976, Art. I, Sec. I, Par. XXII; Ga. Const. of 1945, Art. I, Sec. I, Par. XVIII; Ga. Const. of 1877, Art. I, Sec. I, Par. XVIII.

The 1868 Constitutional Convention's charge was in part to advance racial equality. See *Ammons*, 315 Ga. at 165 (3) (citing First Reconstruction Act of 1867, § 5 (1867), to note that Congress directed that Georgia's 1868 Constitution had to both "conform[] with the Constitution of the United States in all respects" and ensure "that the elective franchise shall be enjoyed by all persons [male and at least 21 years old] of whatever race, color, or previous condition"). But almost immediately, Georgia courts began interpreting the Provision in a very different way. The year after the Provision was ratified, a black woman criminally charged for cohabitating with a white man argued that the statutory prohibition on interracial marriage violated the Provision. This Court vehemently rejected that argument:

31

> [T]he very reverse is true. That section of the Constitution forever prohibits legislation of any character regulating or interfering with the social *status*. It leaves social rights and *status* where it finds them. It prohibits the Legislature from repealing any laws in existence, which protects persons in the free regulation among themselves of matters properly termed social, and it also prohibits the enactment of any new laws on that subject in the future.

*Scott v. Georgia*, 39 Ga. 321, 324 (2) (1869). Noting the various forms of segregation in effect at the time of the adoption of the new Constitution, the Court continued: "In all of this they were protected by the common law of this State. The new Constitution forever guarantees this protection, by denying to the Legislature the power to pass any law withdrawing it or regulating the social *status* in such assemblages." Id.

The Georgia Court of Appeals later said that the Provision did not constrain the judicial branch's ability to "take judicial notice of an intrinsic difference between the two races[,]" when it employed the Provision to allow a white railroad passenger to seek damages from a railroad company whose conductor mistakenly referred to the passenger as black:

> Our Constitution . . . declares that the social status of the

32

citizen shall never be the subject-matter of *legislation*. It has been said that this language was used for the express purpose of leaving the social status open to judicial determination. We, however, shall not take any such fanciful position; for it can not properly be said that that which can not be the subject-matter of legislation can be judicially administered. This, however, does not affect the subject of judicial notice of matters of history, common knowledge, etc. The sounder view is, that neither Legislatures nor courts shall grade the citizen according to this social status, and yet that the courts can and must notice the meaning of words of opprobrium, as well as the connection in which these words are used.

See *Wolfe v. Ga. Ry. & Electric Co.*, 2 Ga. App. 499, 504-506 (3) (58 SE 899) (1907). This Court later held that evidence about the race of a bottling company's inspectors was not admissible to show the inspectors' relative efficiency. See *Atlanta Coca-Cola Bottling Co. v. Shipp*, 170 Ga. 817, 820 (2) (154 SE 243) (1930). But the Chief Justice felt compelled in his concurrence to distinguish the case from the Court of Appeals' prior ruling in *Wolfe*, which he characterized as remaining good law. See id. at 824 (Russell, C.J., concurring).

So what to make of such a provision now? Cases like this serve as a reminder that we focus on history not because it is always good, but because the rule of law requires it. To discern the meaning of

33

legal text, we must determine its original public meaning — what the language meant at the time and place in history when it was enacted. Original public meaning is an interpretive methodology that promotes the rule of law by, among other things, constraining judges. By its application, we limit ourselves to only those interpretations of legal text that can be supported by text, history, and context. The meaning produced by those interpretations can only be as good as our history.

And there is much in our history that is shameful. The racist history of this Court's interpretation of the Provision reminds us of this truth once again. But a proper application of our interpretive methodology requires honest grappling with that history; we cannot wish it away.[7]

---

[7] The drafters of the 1983 Constitution appear not to have grappled with the history of the Provision. See Committee to Revise Article I, Subcommittee to Revise Section I, Oct. 4, 1979, meeting, at pp. 120-121; Committee to Revise Article I, Subcommittee on Rights of Persons, Oct. 25, 1979, meeting, at pp. 109-111. Justice Jesse Bowles informed confused committee members that this provision meant that the legislature could not create formal classes of persons: "They can't name you a king or a queen to the exclusion of your neighbor or a prince or a lord." Committee to Revise Article I, Subcommittee to Revise Section I, Oct. 4, 1979, meeting, at pp. 120; see also Committee to Revise Article

Here, however, that shameful history is just that — history. To the extent that the Provision's language prohibiting legislation with respect to "social status" was thinly veiled code for preserving racial discrimination, including segregation, any such application of the Provision squarely violated the Fourteenth Amendment to the United States Constitution. See, e.g., *Loving v. Virginia*, 388 U.S. 1 (87 SCt 1817, 18 LE2d 1010) (1967); *Brown v. Board of Education*, 347 U.S. 483 (74 SCt 686, 98 LE 873) (1954). Any such meaning thus has no effect whatsoever.

Session thus argues that the Provision must mean something else today, and that such an alternative meaning renders the Registry unconstitutional. Whether or not the Provision has an alternative meaning is a question we need not decide today,[8]

I, Subcommittee on Rights of Persons, Oct. 25, 1979, meeting, at pp. 109 (Justice Bowles: "It has to do with classes of individuals. You can't be a lord or a duke or earl or duchess.").

[8] So far as we can tell, other than in *Scott*, we have referenced this Provision explicitly in only three other majority opinions throughout our history, and each of those only in passing. See *Clark v. Wade*, 273 Ga. 587, 598 (IV) & n.57 (544 SE2d 99) (2001) (citing the Provision without analysis as a "see also" in a footnote in support of the textual statement that by harm to a child for purposes of application of the best-interest-of-the-child standard, "we

because Session does not show that he would prevail under any such meaning.

As alluded to above, Session contends that the Provision now "can be interpreted as barring the legislature from creating preferred or reviled classes of citizens." Session says that "society" aims "visceral animus" toward sex offenders and that "[e]ven other prisoners loathe" them. But Session fails to show how the registration requirement and related provisions, rather than the fact of being convicted of a sex offense, "created" a particular class of citizens — people convicted of sex offenses — or caused "society" to

---

mean either physical harm or significant, long-term emotional harm; we do not mean merely social or economic disadvantages"); *Livingston v. State*, 264 Ga. 402, 404 & n.5 (444 SE2d 748) (1994) (citing the Provision as a "see also" in support of the phrase "we have held that it would be constitutionally impermissible for a jury to base its death penalty recommendation on the victim's class or wealth"; a footnote stated that the Provision "was added to the Georgia Constitution in 1868 to promote equality in the eyes of the law amongst people of all races and classes" and that the principle underlying the Provision was "that an individual's social status is not relevant to the evenhanded administration of justice," a proposition for which we inexplicably cited *Scott*); *State ex rel. Waring v. Ga. Med. Soc'y*, 38 Ga. 608, 627-630 (1869) (leaving unaddressed argument that corporate bylaw adopted under a legislatively approved corporate charter and prohibiting "ungentlemanly conduct" violated the Provision, given there was no evidence of ungentlemanly conduct).

treat that class of persons differently. And Session has offered no proposed plausible construction of the Provision that would prohibit criminalizing certain types of conduct on the theory that it would create a disfavored class comprising those convicted of such crimes. Accordingly, Session's argument fails.

*Judgment affirmed. All the Justices concur.*