**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: August 13, 2024

S24A0716. PINKINS v. THE STATE.

COLVIN, Justice.

Appellant Nathanieo Pinquez Pinkins appeals following his convictions for malice murder and related offenses in connection with the shooting death of Cheryl Loving and the shooting of Desiraee Clay.[1] On appeal, Appellant argues that the trial evidence

___

[1] The crimes occurred on November 14, 2018. On November 21, 2019, a Gwinnett County grand jury issued a nine-count superseding indictment, charging Appellant with crimes against Loving in Counts 1 through 5 and crimes against Clay in Counts 6 through 9. Appellant was charged with malice murder (Count 1), felony murder (Count 2), aggravated assault (Counts 3 and 8), home invasion (Count 4), possession of a firearm during commission of a felony (Counts 5 and 9), and aggravated battery (Counts 6 and 7).

A jury trial was held from March 13 through 23, 2023. The jury found Appellant not guilty of home invasion (Count 4) but guilty of the remaining counts. The trial court sentenced Appellant to life in prison with the possibility of parole for malice murder (Count 1) and imposed five-year consecutive sentences for each of the two counts of possession of a firearm during commission of a felony (Counts 5 and 9) and a 20-year consecutive sentence for aggravated battery (Count 6). The court vacated the felony-murder count by operation of law and merged Counts 3, 7, and 8 for sentencing purposes.

Appellant timely filed a motion for new trial on April 11, 2023, and

was constitutionally insufficient to support his conviction for the malice murder of Loving and that the trial court abused its discretion in denying his pretrial motion to sever for trial the counts alleging crimes against Loving from the counts alleging crimes against Clay. As explained below, we are unpersuaded by Appellant's arguments and therefore affirm his convictions.

1. The trial evidence showed the following. Appellant and Clay met and started dating in 2014. At some point during that year, Clay became pregnant with Appellant's child. And in late 2014, Clay and her son from a prior relationship moved in with Loving, whom Clay described in her testimony as an older woman, a motherly figure, and a friend. Appellant visited Loving's home in Lawrenceville while Clay lived there, and although Clay moved out of Loving's house in March 2015, Clay and Loving remained good friends and kept in touch.

---

amended the motion through new counsel on November 23, 2023. Following a hearing, the trial court denied the amended motion for new trial on January 3, 2024. Appellant timely filed a notice of appeal directed to this Court, and the case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

Appellant and Clay stopped dating when Clay was nine months pregnant, but they got back together six months later, after Clay gave birth to their son. In 2017, Appellant was living in Lawrenceville with Clay and her two sons. But as Clay testified, her relationship with Appellant was "volatile," and she ultimately broke up with him in the summer of 2017 because he kept a handgun in the house that was accessible to the children.

After their breakup, Appellant and Clay remained in contact so Appellant could continue to be part of their son's life. But their relationship was not without difficulties. In February 2018, after seeing some friendly messages between Clay and a male friend on Clay's computer — and despite the fact that Appellant and Clay were no longer dating — Appellant accused Clay of cheating on him. As Clay testified, Appellant grabbed her, dragged her down the hallway into the bathroom, choked her, and told her "he would shoot [her] and shoot himself." Ultimately, Clay got away and called the police. A police officer who was dispatched to the scene testified that Appellant gave a statement in which he admitted that he had

3

"picked [Clay] up against the wall" because "he was upset with [her]" for "cheating on him" and that he "ke[pt] a firearm in his vehicle." The officer further testified that, as a result of the incident, Appellant was arrested for, charged with, and pled nolo contendere to, simple battery.

After the domestic-violence incident, Appellant and Clay continued to stay in contact due to their son. But Clay testified that Appellant would frequently show up wherever she was without invitation.

On November 13, 2018, Clay invited a male friend to come over to her apartment in the evening. When she heard a knock, she opened the door expecting to greet her friend. But no one was there, and she saw Appellant's car "speeding past." Clay's friend never arrived at her apartment that evening, and after seeing Appellant's car drive away, Clay received numerous phone calls and text messages from Appellant. Among those text messages, which were introduced into evidence at trial, were messages saying, "Who are you talking to like a weak lil bitch," "either I can get out your way

4

or APPLY MASSIVE PRESSU . . . RE YOUR WAY," and "He a pussy . . . he ran from me."

Appellant was outside Clay's apartment the next morning when she went to start her car around 7:05 a.m. When Clay saw Appellant, she retreated inside, locked the door, and did not answer when he knocked. Later that morning, Clay took her older son to the school bus and dropped off her younger son at daycare without incident. She then drove to the office building where she worked.

When she arrived, Clay turned into the office building's parking lot and put her car in reverse to back into a parking spot. But before backing up, she looked up and saw Appellant standing "[p]retty close" to the front of her car. According to Clay, Appellant pointed a pistol at her and pulled the trigger, but the gun did not fire. Appellant then racked the slide, at which point Clay realized he was trying to shoot her and pressed the gas to drive in reverse. Clay testified that, as she backed up, she heard several gunshots, and her windshield shattered. Fragments of shattered glass entered Clay's left eye, and a bullet grazed her forehead, as she reversed, narrowly

missing another car that had entered the parking lot before crashing into a parked car and coming to a stop. Clay then drove forward, unsuccessfully attempting to hit Appellant with her car before exiting the parking lot.

Surveillance video from the parking lot, which was played for the jury at trial, showed that Appellant's vehicle entered the parking lot at 7:56 a.m. It further captured Clay's vehicle entering the parking lot at 8:05 a.m. and reversing into a parked car less than a minute later, while a man, whom Clay identified as Appellant, advanced toward Clay's car. The footage further showed Clay's vehicle driving forward toward Appellant, who leapt out of the way to avoid being hit. Finally, the surveillance video showed Clay's vehicle exiting the parking lot at 8:06 a.m. and Appellant's vehicle exiting at 8:07 a.m.

After the shooting, Clay drove to a nearby daycare, where staff assisted her and called 911. When police officers arrived, they found Clay's car in front of the daycare with bullet holes in the hood and windshield. And Clay subsequently received medical care for her

6

injuries, including multiple surgeries over several months to remove glass from her eye and to replace the lens of her eye.

It was undisputed at trial that, after exiting the parking lot of Clay's office building at 8:07 a.m., Appellant drove to Loving's house, which was about ten miles away, a 20-minute drive. Data extracted from Loving's cell phone revealed that, around the time of Appellant's arrival at Loving's house and in the minutes that followed, several calls were placed by, and received on, Loving's cell phone. First, Loving's phone placed a call to Clay's phone number at 8:29 a.m., although it did not connect. Four minutes later, Loving's phone placed a call to 911. In the 911 call, which was recorded and played for the jury, the 911 operator answered the phone, and the caller could be heard making indiscernible noises in response. Then, at 8:34 and 8:36 a.m., phone calls were placed from Loving's phone to phone numbers belonging to Appellant's mother and father, and at 8:38 a.m., Loving's phone received a call from the number belonging to Appellant's father. Surveillance video from a store down the street from Loving's house captured Appellant's car

7

driving away from Loving's house at 8:46 a.m.

About two hours later, a Goodwill employee from a location about ten miles from Loving's house found Appellant in Appellant's car at the donor door. Appellant, who was naked and wrapped in a blanket, said he had been shot, and the Goodwill employee called 911. Several police officers responded to the Goodwill, finding Appellant bloody with a gunshot wound under his chin and an exit wound around his left ear. Officers testified that Appellant, who was sitting in the driver's seat of his car, was going in and out of consciousness. As body camera footage admitted at trial showed, while Appellant was sitting in his car, one of the officers asked Appellant where he had been shot, and Appellant appeared to indicate that he had been shot in the neck or head. The officer then asked Appellant, "Did you do it?" And Appellant appeared to respond by nodding his head in the affirmative.

Prompted by a call from Loving's daughter, who was unable to reach Loving by phone on the morning of the shooting, Loving's brother drove to Loving's house to check on her. When he arrived,

he found Loving shot dead in the hallway, lying on her back with her pants and underwear pulled down to her knees. Loving's brother called 911, and police officers responded to the scene.

At Loving's house, police officers found blood not only in the hallway where Loving was found, but also in an adjacent kitchen area, throughout the living room from the hallway to the front door, on the front door, on the front porch, and out in the driveway. Officers also found bullet defects in the living-room ceiling and in the hallway walls, a total of five shell casings in the living room and hallway, and bullets or bullet fragments in the living room, the wall next to Loving, and the attic. Near Loving's body, officers found a bloody slipper, a coffee carafe on the ground, and coffee stains on the wall. And on the living room floor, officers found a bloody pen. Officers who responded to the scene of Clay's shooting found six spent shell casings and one unspent round in the parking lot. And when officers later searched Appellant's car, they found a bloody .380-caliber Bersa pistol and Appellant's clothing covered in "an immense amount of blood."

Forensic DNA analysis later revealed that Appellant's blood was in various locations around Loving's house, including in the driveway, on the front door, and in the kitchen. Swabs of Loving's breast, thigh, and labia revealed the presence of DNA belonging to Appellant or someone in Appellant's "paternal line," although the test results did not establish which type of bodily substance was the source of the DNA. An analysis of a latent fingerprint left on Loving's doorknob revealed that it belonged to Appellant. And a firearms examiner confirmed that the cartridge cases recovered from both crime scenes were fired from Appellant's Bersa pistol.

The medical examiner who performed Loving's autopsy testified that Loving had two gunshot wounds, a potentially fatal gunshot wound to the neck and a fatal gunshot wound that entered the left upper arm and perforated her torso. Based on the soot and stippling found around the gunshot wound to the neck and the stippling found around the gunshot wound to the arm, the medical examiner testified that the gunshots were from close and medium range, meaning from less than one foot and one-to-three feet away,

respectively.[2] The medical examiner further testified that she found round blood drops on Loving's thigh that looked like they may have dripped down onto her from someone else.

Appellant took the stand in his own defense. He testified that he dated Clay for about two years and had a child with her. But he said that the relationship was on and off because for a significant portion of the relationship he was still married to, and trying to reconcile with, a woman in Mississippi with whom he also had children.

Appellant testified that he met Loving through Clay in 2014. Appellant described Loving as "a neighborhood hero." He further said that he kept in contact with Loving over the years, that he had asked Loving to put in "some good words" for him with Clay when he was trying to rekindle the relationship, and that he would go over to Loving's house to talk when he had relationship problems with Clay. When asked, Appellant denied ever having a sexual or

---

[2] Appellant's firearms expert testified that, from the evidence, he concluded that Loving was shot in the neck and arm from approximately two inches away and three-and-a-half inches away, respectively.

11

romantic relationship with Loving.

Appellant acknowledged his role in the 2018 domestic-violence incident at Clay's apartment. He also acknowledged that he sometimes went to Clay's apartment unannounced to see his son, whom he wanted to see more frequently. And he expressed frustration that Clay would not allow him to visit his son.

Appellant testified that, on November 13, 2018, he was in good spirits because he felt like he was getting his life together, and he hoped that, as a result, Clay would allow him to see his son more often. After work that day, Appellant went to Clay's apartment to visit his son. But when he arrived, he saw a man walking up the stairs to Clay's door. Appellant said that he was frustrated about not being able to see his son and walked up the stairs after the man, who then walked away. Appellant admitted that he sent Clay derogatory text messages that night because he was upset. And he said that, after the man left, he drove to Loving's house.

Appellant testified that it was too late to visit with Loving, so he parked in her driveway and slept in his car. The next morning,

on November 14, 2018, Loving woke up Appellant. According to Appellant, he told Loving about the guy at Clay's apartment, but he had to go to work, so Loving told him to come back to her house to talk after his workday.

Appellant testified that he still wanted to see his son that morning, so he went back to Clay's apartment. But he said that Clay ran away when she saw him, causing him to become "highly upset." Appellant testified that he drove to Clay's workplace. And according to Appellant, when Clay pulled into the parking lot, he "just start[ed] shooting at the vehicle" because he "just wanted to hurt her." Appellant said that after Clay left the parking lot, he went back to Loving's house because he thought she could calm him down.

Appellant described honking his horn in Loving's driveway until she came out of her house. According to Appellant, when he told Loving that he had hurt Clay, she invited him to come inside to talk about it. Appellant testified that, after going inside, taking off his jacket, and telling Loving that he shot Clay, Loving inquired about the location of the gun. Appellant said that he then went out

to his car intending to find the gun and hide it behind Loving's house, but he was unable to locate the firearm.

According to Appellant, when he returned to Loving's house, she had found the gun in his jacket pocket. Appellant testified that the gun "was in her hand," and she raised it to either give it to him or aim it. Although he testified that he did not fear for his life, Appellant said that he "rushed her" to get the gun back, resulting in a struggle over the gun. Appellant testified that he then heard two shots, the first of which hit the ceiling and the second of which hit his neck and head. "I was pure adrenaline after that," Appellant said.

Appellant agreed that the gun was fired at least five times in Loving's home, but when asked what happened to the remaining three rounds, he said he did not remember what had happened, and he "guess[ed] [they] continued to struggle for the gun." Appellant said that Loving was hurt by accident. He denied having any "malicious intent at all" when he went to Loving's house, denied intending to harm Loving, denied acting in self-defense, and denied

14

having anything to do with Loving's pants being pulled down. Appellant said that he tried to get help for Loving when it looked like she was not breathing anymore, and he admitted that he was the caller on the 911 call previously played for the jury. He denied having called Clay from Loving's phone but admitted that he had used Loving's phone to call his parents. When asked about the body camera footage that appeared to show him nodding affirmatively when the officer asked if he shot himself, Appellant testified that, at the time, he believed he was responding to a different question. And he denied shooting himself, maintaining that he was instead shot during the struggle with Loving for the gun.

2. Appellant argues that the trial evidence was insufficient as a matter of constitutional due process to prove that he killed Loving with malice aforethought because, according to Appellant, he had no discernable motive to kill Loving and there was no proof that he had the deliberate intention to take Loving's life or that he acted with an abandoned and malignant heart. This claim of error fails.

When evaluating the sufficiency of trial evidence as a matter

15

of constitutional due process, "the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Holmes v. State*, 311 Ga. 698, 700 (1) (859 SE2d 475) (2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "This Court views the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. at 700-701 (1) (citation and punctuation omitted).

"A person commits the offense of [malice] murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). "Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof." OCGA § 16-5-1 (b). "Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Id. And "[t]he malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of

16

the killing." *Scoggins v. State*, 317 Ga. 832, 836 (1) (a) (896 SE2d 476) (2023) (citation and punctuation omitted).

Here, the trial evidence was constitutionally sufficient to support Appellant's malice-murder conviction.[3] As an initial matter, there was overwhelming evidence that Appellant killed Loving. The witness testimony and forensic evidence revealed that Appellant shot Clay with the same firearm that was used soon thereafter to kill Loving and that was present in Appellant's vehicle following Loving's death. Further, Appellant's blood and DNA were found in multiple locations around Loving's house and on her body. And when testifying, Appellant did not deny causing Loving's death.

There was also strong evidence that Appellant intentionally killed Loving or did so with an abandoned and malignant heart. The jury could reasonably infer that Appellant intended to kill Clay from

---

[3] Although Appellant argues that the trial evidence failed to establish a motive for Appellant to kill Loving, he correctly acknowledges that "the State is not required to prove [a] defendant's motive for killing [a] victim to sustain a murder conviction." See *Hall v. State*, 308 Ga. 475, 477 n.4 (841 SE2d 672) (2020) (noting that "the State was not required to provide a motive" to establish malice murder).

17

his admitted attempt to harm her by firing multiple rounds into the vehicle she occupied. See *Dozier v. State*, 307 Ga. 583, 585 (837 SE2d 294) (2019) (concluding that there was sufficient evidence of intent to support a malice-murder conviction where the defendants "knew that there were people inside the house" when they "fired multiple shots through the bedroom door," killing the victim). And as the prosecutor reasonably argued in closing arguments, the jury was authorized to find that Appellant had a similar intent when, about 25 minutes later, he fired multiple rounds at a person Appellant knew had a close personal relationship with Clay, namely, Loving. See *Raheem v. State*, 275 Ga. 87, 87-88 (1) (560 SE2d 680) (2002) (holding that the trial evidence was sufficient to prove the malice murder of a man and his mother where the defendant shot the man in the head, then drove to the man's mother's house and shot her in the head), disapproved of on other grounds by *Patel v. State*, 282 Ga. 412 (651 SE2d 55) (2007). Appellant's testimony that Loving's death was an accident and that he did not intentionally kill her also constituted substantive evidence of his guilt if disbelieved by the

jury. See *Maynor v. State*, 317 Ga. 492, 498 (2) (a) (893 SE2d 724) (2023) ("The jurors were also authorized to consider their disbelief in Appellant's testimony . . . as substantive evidence of his guilt."); *Mims v. State*, 310 Ga. 853, 855 (854 SE2d 742) (2021) ("[A] defendant's testimony, in which he claimed he was justified or provoked into acting, may itself be considered substantive evidence of guilt when disbelieved by the jury, as long as some corroborative evidence exists for the charged offense."). And the manner in which Loving was found — shot through the neck and arm from close to medium range with her pants and underwear pulled down and DNA likely belonging to Appellant on her breast, thigh, and labia — authorized a jury finding that Appellant acted with an abandoned and malignant heart. See *Dupree v. State*, 303 Ga. 885, 887 (1) (815 SE2d 899) (2018) (holding that "sufficient evidence of malice aforethought was presented by the manner in which the victim was assaulted prior to her death").

Although Appellant acknowledges that Georgia's inconsistent-verdict rule has been abolished, he argues that a "defendant [is] still

. . . protected from juror irrationality through the appellate review of the sufficiency of the evidence," *Thornton v. State*, 298 Ga. 709, 714 (2) (784 SE2d 417) (2016) (citation and punctuation omitted), and he contends that it was irrational for the jury to find him guilty of malice murder but not guilty of invading Loving's home. Specifically, he argues that, because the malice-murder charge required Appellant to intentionally kill Loving and the home-invasion charge required Appellant to enter Loving's home with the intent to murder her, "Appellant either intentionally killed Loving, or he did not enter her house with any such intent, but not both."

Appellant's argument is unpersuasive. "Whether a killing was intentional and malicious is for the jury to determine," *Scoggins*, 317 Ga. at 836 (1) (a), and "it is not for the courts to inquire into the jury's deliberations for any inconsistency between guilty and not guilty verdicts," *Thornton*, 298 Ga. at 714 (2) (citation and punctuation omitted). Moreover, Appellant's argument fails on its own terms. Contrary to Appellant's contention, it would not have been irrational for the jury to conclude that Appellant developed the

20

intent to kill Loving only after he entered her house, such that he lacked the requisite intent to commit home invasion but had the required intent for malice murder. Compare OCGA § 16-7-5 (b) (requiring that a person "enter[ ]" another's dwelling house "with intent to commit a forcible felony therein"), with OCGA § 16-5-1 (a) (requiring that the defendant "causes" a death "with malice aforethought"). See also *Scoggins v. State*, 317 Ga. 832, 836 (1) (a) (896 SE2d 476) (2023) ("The malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." (citation and punctuation omitted)). And as the trial court correctly noted in denying Appellant's motion for new trial, the jury also could have found Appellant not guilty of home invasion for reasons unrelated to intent. Specifically, the offense of home invasion, unlike the offense of malice murder, requires that a person enter another's home "without authority." OCGA § 16-7-5 (b). And Appellant's testimony that he had previously visited Loving's house to seek advice and that Loving invited him inside after Clay's shooting supported a jury finding that Appellant had permission to

enter her home and thus did not enter the home "without authority." Id. Thus, Appellant has not shown that the verdicts reflected any irrationality on the part of the jury. Nor has he shown that the trial evidence was constitutionally insufficient to support his malice-murder conviction.

3. Appellant argues that the trial court abused its discretion in denying his pretrial motion to sever for trial the counts alleging crimes against Loving from the counts alleging crimes against Clay. According to Appellant, he was entitled to severance as a matter of right because, contrary to the trial court's finding, the charges were joined solely because they were of the same or similar character. And he argues that, even if he was not entitled to severance as a matter of right, the trial court nevertheless abused its discretion in failing to sever the counts for several reasons. Specifically, he argues that the case involved "complex and multifaceted evidence"; that it was "inevitable" that evidence regarding Clay, and in particular the OCGA § 24-4-404 (b) ("Rule 404 (b)") evidence regarding the 2018 domestic-abuse incident involving Appellant and Clay, would

22

"spill[ ]over in the minds of the jurors" as they considered the alleged crimes against Loving; and that joinder "constrained [Appellant] at trial to admit his complicity in the Clay case, while at the same time present[ing] a seemingly incongruent defense in the Loving case of accident." We are unpersuaded by Appellant's arguments.

"This Court has held that a defendant has a right to severance where the offenses are joined solely on the ground that they are of the same or similar character because of the great risk of prejudice from a joint disposition of unrelated charges." *Lowe v. State*, 314 Ga. 788, 791 (2) (a) (879 SE2d 492) (2022) (citation and punctuation omitted). But "where the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge." Id. (citation and punctuation omitted). "If severance is not mandatory, it is nevertheless incumbent upon the trial court to determine whether severance is necessary to achieve a fair determination of the defendant's guilt or innocence as to each offense." *Price v. State*, 316 Ga. 400, 404 (2) (888 SE2d 469) (2023)

(citation and punctuation omitted). "This inquiry requires the trial court to consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." Id. (citation and punctuation omitted).

The trial court did not abuse its discretion in denying Appellant's motion to sever the counts regarding Clay from the counts regarding Loving. As an initial matter, severance was not mandatory because the offenses were not "joined solely on the ground that they [were] of the same or similar character." *Lowe*, 314 Ga. at 791 (2) (a) (citation and punctuation omitted). Rather, as the trial court correctly found, they were joined together because they were based on "a series of acts connected together," id. (citation and punctuation omitted), namely, two shootings with the same gun within a period of approximately 25 minutes and involving two victims who had a relationship both with each other and with Appellant. See *Hubbard v. State*, 275 Ga. 610, 611-612 (2) (571 SE2d 351) (2002) (holding that the trial court did not err in denying a

24

motion to sever charged crimes committed at different locations with "the same guns" because, "[a]lthough there were several victims, the crimes against them occurred mere hours apart, in the same general area, and in the same manner" as "part of a continuing course of conduct"). Cf. *Jackson v. State*, 294 Ga. 431, 433 (2) (754 SE2d 322) (2014) (holding that the trial court properly granted a motion to join charges for trial where the murder of one victim and the armed robbery of another victim were committed within a mile, within a short period of time, and with the same gun). See also *Doleman v. State*, 304 Ga. 740, 744-745 (3) (822 SE2d 223) (2018) ("[S]everance was not mandatory because all of the offenses involving [the appellant], including the ones which did not occur on the day of the murder, reflected a continuous crime spree."); *Davis v. State*, 279 Ga. 11, 13 (3) (608 SE2d 628) (2005) (holding that severance of counts based on crimes occurring "on separate days" was not mandatory because "the State explained [at the pretrial hearing] that it expected the evidence to show that the crimes were part of a continuing crime spree").

Appellant also has not shown that "severance [was] necessary to achieve a fair determination of [his] guilt or innocence as to each offense." *Price*, 316 Ga. at 404 (2) (citation and punctuation omitted). First, Appellant is correct to note that the trial included many witnesses and exhibits, but this was primarily due to the number of law enforcement officers involved in the investigation. Notwithstanding the number of witnesses and exhibits, the case did not involve particularly complex evidence or an unwieldy number of charges, such that a trier of fact would be "[un]able to distinguish the evidence and apply the law intelligently as to each offense." Id. (citation and punctuation omitted).

Second, Appellant contends that joinder of the charges permitted the jurors to consider evidence regarding the crimes against Clay, including the Rule 404 (b) evidence about the 2018 domestic-abuse incident involving Appellant and Clay, when evaluating the charges alleging crimes against Loving. But the trial court instructed the jury not to consider the Rule 404 (b) evidence when evaluating Appellant's guilt or innocence of the charges in

which Loving was the alleged victim. Specifically, the court charged the jurors that they were not permitted to "infer from [the Rule 404 (b)] evidence that [Appellant was] of a character that would commit such crimes," that the evidence could "be considered only to the extent that it may show the issues that the State [was] required to prove in the crimes [against Clay] charged in Counts 6 through 9," and that the evidence could "not be considered by [the jurors] for any other purpose." We presume that the jurors followed these instructions absent any evidence to the contrary. See *Charles v. State*, 315 Ga. 651, 660 (4) (884 SE2d 363) (2023). And Appellant has not shown that any other evidence regarding the crimes against Clay undermined the jury's ability to fairly assess Appellant's guilt or innocence of the counts alleging crimes against Loving.

Finally, Appellant has not shown either that trying all the counts together "constrained" his defense or that presenting a seemingly "incongruent" accident defense to the charges alleging crimes against Loving undermined a fair determination of his guilt or innocence as to each offense, as he claims. Appellant does not even

argue that he would have pursued different defense theories if the charges had been severed. And a review of the trial evidence shows that the strong evidence of his guilt — including Clay's eyewitness testimony and the forensic evidence from both crime scenes — would have made it difficult for him to pursue a different defense theory as to either set of charges, even if those charges had been tried separately. Moreover, Appellant has not shown that presenting an accident defense to the counts alleging crimes against Loving while admitting the crimes against Clay prevented the jury from "distinguish[ing] the evidence and apply[ing] the law intelligently as to each offense." *Price*, 316 Ga. at 404 (2) (citation and punctuation omitted). Indeed, Appellant has pointed to no evidence of jury confusion, and the fact that the jury acquitted Appellant of one charge involving Loving indicates that the jury was able to distinguish the evidence and intelligently apply the law to each charge. See *Carson v. State*, 308 Ga. 761, 765-766 (2) (843 SE2d 421) (2020) (holding that the trial court did not abuse its discretion in denying a motion to sever where crimes against two victims

28

"occurred only a few blocks apart and within a short period of time" and the jury's verdicts, which included an acquittal for one charge, "show[ed] that the jury fully understood the law and evidence" (citation and punctuation omitted)); *Strozier v. State*, 277 Ga. 78, 81 (5) (a) (586 SE2d 309) (2003) (holding that there was "no question" that jurors were able to "distinguish the evidence and apply the law intelligently to each offense" because the appellant "was acquitted of two counts" (citation and punctuation omitted)). Accordingly, the trial court did not abuse its discretion in denying Appellant's motion to sever.

*Judgment affirmed. All the Justices concur.*