NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0213.  LEE v. THE STATE.

PINSON, Justice.

Terrence Darnell Lee was convicted of felony murder and other crimes in connection with five separate incidents in the summer of 2018, one of which resulted in the shooting death of Kemar Hawkins.[1]

---

[1] The incidents took place on July 21, July 25, July 28, July 29, and August 2, 2018, with the fatal shooting happening on the last date, August 2, 2018. On November 7, 2018, a Gwinnett County grand jury indicted Lee for felony murder predicated on home invasion (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), home invasion (Count 4), and possession of a firearm during the commission of a felony (Count 5), all in connection with the August 2 incident, home invasion (Count 6), aggravated assault (Counts 7 and 8), and possession of a firearm during the commission of a felony (Count 9), all in connection with the July 21 incident, home invasion (Count 10), aggravated assault (Count 11), and possession of a firearm during the commission of a felony (Count 12), all in connection with the July 25 incident, home invasion (Count 13), armed robbery (Counts 14 and 15), aggravated assault (Counts 16, 17, 18, 19, 20, and 21), and possession of a firearm during the commission of a felony (Count 22), all in connection with the July 28 incident, armed robbery (Counts 23 and 24), aggravated assault (Counts 25 and 26), and possession of a firearm during the commission of a

On appeal, Lee contends that the trial court abused its discretion by admitting evidence of a separate incident that took place in Florida two weeks before the charged crimes; that the trial court should have granted his motion to sever the counts related to the

felony (Count 27), all in connection with the July 29 incident, and possession of a firearm by a convicted felon (Counts 28, 29, 30, 31, and 32) on each of the five incident dates. Lee was later re-indicted on the same counts on February 5, 2020.

Lee was initially tried before a jury in March of 2020, but that trial ended abruptly because of the COVID-19 pandemic, and the trial court declared a mistrial in a virtual hearing in June 2020. Lee's second jury trial took place from April 13 to 25, 2022. The jury found Lee guilty on all counts. (The trial was bifurcated so that the jury did not hear about the felon-in-possession charges in Counts 28-32 until after it had reached a verdict on Counts 1-27.) The trial court sentenced Lee to life in prison for felony murder predicated on aggravated assault (Count 2) and for each of the home invasion and armed robbery convictions in Counts 4, 6, 10, 13, 14, 15, 23, and 24, 20 years in prison for each of the aggravated assault convictions in Counts 7, 8, 11, 16, 18, 19, and 21, 10 years in prison for possessing a firearm as a convicted felon on August 2 (Count 28), and 5 years in prison for each conviction for possession of a firearm during the commission of a felony in Counts 5, 9, 12, 22, and 27, all to be served consecutively, as well as 10 years in prison for the remaining convictions for possessing a firearm as a convicted felon (Counts 29, 30, 31, and 32), to be served concurrently with Count 28, for a total term in prison of 9 life sentences plus 175 years. The remaining counts merged for sentencing or were vacated by operation of law.

Lee filed a timely motion for new trial, which he later amended. The parties agreed to have the motion decided on the briefs. On May 7, 2024, the trial court denied Lee's motion for new trial. Lee filed a timely notice of appeal. The appeal was initially docketed as case S24A1239. However, this Court remanded the case so that Lee could move the trial court to supplement the record on appeal with the record from his first indictment and trial. The trial court granted that motion. Lee then filed a timely renewed notice of appeal. The case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

2

incident that caused Hawkins's death; that insufficient evidence supported his convictions arising from the incident of July 25, 2018, because no competent evidence showed that he possessed a weapon; that, in regard to that same incident, the trial court should have instructed the jury about the offenses of burglary and simple assault as lesser included offenses of home invasion and aggravated assault; that the trial court abused its discretion by allowing a detective to identify Lee in surveillance footage that was played for the jury; and that the cumulative effect of these errors requires a new trial.

We affirm Lee's convictions. Any error in admitting the Florida incident was harmless. The trial court had discretion not to sever the murder-related counts because all the offenses charged in the indictment were close in time and space and part of a "crime spree," and Lee has not shown that he was forced to proceed at an unfair disadvantage due to the joinder of all the charges together. Sufficient evidence supported Lee's convictions relating to the July 25 incident, because a rational jury could conclude that the perpetrator of that incident had a gun. As to that same incident, the trial court

3

was not required to instruct the jury about any lesser included offenses, because no evidence supported that Lee committed only the lesser offenses. Any error in allowing the detective to identify Lee in the surveillance video was harmless. And Lee has not shown that the cumulative effects of any errors deprived him of a fair trial.

1. *Background*

The evidence at trial showed that Lee was involved in five separate incidents over a two-week period in the summer of 2018.

(a) *Incident of July 21, 2018*

On the night of July 20-21, 2018, Alaya Daniels was in her bedroom in Snellville sometime after 3:00 a.m., talking with her boyfriend on the phone, when someone opened the door of her room. Alaya was not alarmed at first, because she thought the intruder was one of her brother's friends from out of town who were staying at the home. Alaya said to the intruder, "[N]o, y'all not sleeping in my room." The intruder said, "[W]here's Chi Town?" Alaya said she did not know anyone named Chi Town and asked who the intruder was. The intruder said, "[T]his is T." Then he left and closed the

4

door.

Moments later, Alaya's brother, Almari, was awakened by someone shining a flashlight in his face and tapping on his leg. Almari did not get a good look at the person, but he saw that he was wearing Nike Jordan 11 sneakers. In a whispered voice, the person said, "[G]ive it up." Almari saw that he had a gun. Almari got out of bed and went to his closet as if to get something for the person, but then they started "tussling," and Almari managed to push the person out of his room. As Almari braced the bedroom door closed, the assailant shot through the door. Almari was not hit.

The commotion woke up Almari's mother, Venicia. She came out of her bedroom and saw a man dressed in black. The man shot at Venicia. Venicia jumped back behind her bedroom door.

Alaya, meanwhile, had overheard the scuffle and the gunshots from her own room. She fled upstairs and called 911 from a closet.

After the intruder finally left, the family came out of hiding. They saw that the screen on the kitchen window had been removed where the intruder had broken into their home. When police later

arrived and processed the crime scene, they found several spent 9-millimeter bullet casings.

At trial, Almari Daniels testified that he was sometimes known as "Chi Town" among the people with whom he regularly played basketball. One of those people was Lee.

(b) *Incident of July 25, 2018*

On the night of July 24-25, 2018, Tionne Blagman was awakened by someone standing in the shadows in her bedroom doorway. She thought the person was her brother, Kychid, but when she spoke to the person, he did not respond and vanished from the doorway. Tionne went to tell Kychid what she had seen. Kychid was sleeping in his own room with his girlfriend, Donaria. When he heard about the person Tionne had seen, he thought it might have been his and Tionne's mother coming home from work, so he told Tionne to check outside the house to see if that was the case. Tionne went outside and saw a figure crouched outside the window of Kychid's room. The person told Tionne to go back inside, which she did. Then she told Kychid what she had seen, and Kychid went to see for himself.

When Kychid got to the living room, he saw a shadow through the window near the front door. He grabbed a kitchen knife and went to guard the door. Kychid asked who was at the door, and the man said it was "Ray" or "Tay." The man started kicking at the door, but he was unable to get in. Tionne and Donaria, meanwhile, had retreated deeper into the home.

Suddenly the man climbed in through Kychid's bedroom window. Tionne fled to her own room, while Donaria ran into a third bedroom and climbed out the window to escape the home. Kychid also saw that the man was in the house, and he ran outside. Both Kychid and Tionne heard gunfire from the living room. No one was hit.

Tionne called 911. When police arrived, they found several 9-millimeter spent shell casings in the living room, a screwdriver on the ground outside Kychid's pried-open window, and several muddy footprints outside the front door. The footprints were later determined to have been made by Jordan 11 sneakers.

(c) *Incident of July 28, 2018*

On the night of July 27-28, 2018, Leonard Jolly and several friends were sleeping in the front room of Jolly's home in Snellville when they were awakened by an intruder. The man, who had come in through a window from which he had removed the screen, was wearing a face mask, a gray Nike hoodie with a backpack underneath, jean or cargo shorts that looked "rugged," and Jordan 11 sneakers. He was carrying a handgun with an extended magazine. The man pointed the gun at the group and asked if they had any cash, and one of the victims gave him some cash. Then he demanded the BMW that was parked outside. When the owner of the BMW did not surrender the keys, the man cocked his gun and threatened to "play a game called eenie meenie miney mo" with the group. To placate the man, one of the other people in the group, Terrell Smith, gave up his own car keys. The man grabbed the keys and left in Smith's car. The car was later recovered nearby.

Jolly called the police. During the ensuing investigation, police obtained surveillance footage from a QuikTrip near Jolly's home.

When police reviewed the tape, it showed a man entering the store shortly before the July 28 incident took place. He was wearing a grey hoodie with a backpack underneath, dark blue shorts with holes or tears at the bottom, and what appeared to be Jordan 11 sneakers, all of which were described by the victims of the July 28 incident. After the man left the QuikTrip, the video showed him walking off in the direction of the Jolly home, where the home invasion would take place soon after. When the video was shown to the jury, the officer who was testifying at the time identified the man in the video as Lee.

(d) *Incident of July 29, 2018*

On the afternoon of July 28, 2018, Shaquille Johnson and Quincy Swindler hosted a cookout at Johnson's home in Snellville. When the cookout ended late in the evening, Johnson and Swindler drove in Swindler's car to a nearby QuikTrip and then returned home. The two men sat in the car outside Johnson's home into the early morning hours of July 29, talking and waiting to hear about the location of another party they planned to attend.

9

Suddenly the passenger door was opened by a masked man with a gun. The man demanded money and jewelry, which the victims gave up. The victims noticed that the gun was a black handgun with an extended magazine, and that the assailant wore blue jean shorts.

Swindler, who was in the driver's seat, reached toward a gun in the center cup holder, but the man warned him not to try anything. The man took that gun, a Glock 27. Swindler got out of the car, but the man told him, "Buddy, you try to run, the bullets will catch you." Swindler did not run. The man then asked "[W]here the other gun at I know you got?" Swindler told him there was a gun in the back seat. The man opened the back door and took Swindler's other gun, an AK pistol, which was inside a black and white checkered backpack. The man ordered Johnson and Swindler out of the car and then told them to run toward some bushes down the street. They complied, and Johnson then ran to his neighbor's home and called the police.

Most of the events of July 29 were captured on video. The robbery itself was recorded by a neighbor's security camera. At trial, that footage was played for the jury while Johnson narrated, and then again while Swindler narrated. The jury also saw surveillance video from the QuikTrip, taken shortly before the robbery of Johnson and Swindler. The QuikTrip footage showed Johnson and Swindler arriving in Swindler's car and parking outside the store. Shortly afterward, a white Volkswagen CC Sport with a distinctive chrome strip on the side — the same make, model, color, and trim as a car that was registered to Lee's sister — arrived at the QuikTrip and parked behind Swindler's car. The driver of the white car never got out. Swindler's car then left the QuikTrip and headed toward Johnson's home, followed by the white Volkswagen. A few minutes later, the white Volkswagen showed up again in the footage from Johnson's neighbor's security camera. It was seen driving past Johnson and Swindler as they sat in Swindler's parked car, then drove back in the other direction.

Later on the day of the robbery, the police showed separate

photo arrays of possible suspects to both Johnson and Swindler. Johnson identified Lee as the assailant, with "sixty" percent confidence. Swindler also picked Lee, with "70 percent" confidence.

(e) *Incident of August 2, 2018*

On the night of August 1 to 2, 2018, Kyron Hawkins was asleep in his home in Snellville when he was awakened by a "loud banging." He ran from his bedroom and found that the light in the family room was on, the outside door was open, and the home was full of smoke. Kyron ran outside and around to the front of the home, where he heard a "gurgling" sound. There, he saw his brother, Kemar, lying on the neighbor's porch. Kemar had been shot three times, and would later die from his injuries. Kyron called 911.

Responding officers gathered witness statements and processed the scene. They found seven spent 9-millimeter casings and bullet fragments inside the home, and several muddy shoe prints both inside and outside. Officers also viewed footage taken by nearby security cameras. In the footage, a red Dodge Journey drove past the entrance to the Hawkinses' subdivision shortly before the shooting,

12

then turned around and entered the subdivision, then turned around again to leave, then turned around a third time to drive into the subdivision. About forty minutes later — a few minutes after the shooting — the Dodge Journey left the area at high speed. Officers were later able to track down the Journey and speak to its registered owner. They determined that Lee was using the car on the night of the shooting.

Additional surveillance footage from the night of the shooting was also shown to the jury. That footage showed a Dodge Journey arriving at 2:42 a.m. in the parking lot of a Walmart near the scene of the shooting. About a half hour later, a man entered the Walmart wearing cutoff jean shorts and black Jordan 11 sneakers. He left the store five minutes later. When the footage was played for the jury, the officer who was testifying at the time identified the man in the video as Lee. Further footage showed that, about five minutes after Lee leaves the Walmart, the Dodge Journey pulled into the parking lot of a QuikTrip across the street, and then left five minutes after that. The Journey then drove off in the direction of Hawkins's home

— where Hawkins would be killed an hour later.

(f) *Further Police Investigation*

The detectives investigating the five home invasions noticed a number of similarities among the incidents. The spent casings recovered from the scene of the August 2 shooting were determined to be fired from the same gun as the casings found at the scenes of the July 21 and July 28 incidents, and all were consistent with having been fired from a Glock 9-millimeter pistol — as were the bullets removed from Kemar Hawkins's body. The shoeprints found at the scene of the shooting appeared to be very similar to those left outside the Blagman home, where the July 25 incident took place, and they all appeared to have been made by Jordan 11 sneakers, which was the model of sneaker identified by the victims of the July 21 and July 28 incidents. Moreover, the Hawkins home, where the August 2 shooting happened, was only a few houses away from the Jolly home, where the July 28 break-in and robbery had occurred. And in both of those incidents, as well as in the July 25 incident, the perpetrator had gotten into the home through a rear window.

14

The detectives from the different investigations gathered to compare notes. Following up on one lead, they looked further into the red Dodge Journey and found that it was associated with an address in Conyers. That address, officers noted, was a few miles from the scene of the August 2 shooting, and was also only about 1000 feet from the spot where Smith's stolen car was found after the July 28 incident. Furthermore, one of the residents associated with the Conyers address matched the physical descriptions of the perpetrator given by the victims of the different home invasions. That resident was Lee.

Officers got a search warrant for Lee's home. The search turned up, among other things, a grey Nike sweatshirt, which was later found to have gunshot residue on it, and a pair of "frayed" jean shorts, both of which matched the description of the perpetrator's clothes given by the victims of at least some of the incidents. Officers also found a pair of black Jordan 11 sneakers. In addition, officers found property that was reported stolen in one of the robberies. In

the garage, they found a black and white checkered backpack containing an ID badge that belonged to Quincy Swindler, one of the victims in the July 29 robbery. And under the bed, officers found a backpack with Swindler's AK pistol inside, as well as a toiletry kit that contained Swindler's .40-caliber Glock 27 handgun and more ammunition.

A few other items of interest were also found in Lee's home. In one of the bedrooms was a Nautica suitcase containing 9-millimeter ammunition and a case for a Glock 26 handgun with a piece of mail addressed to Lee inside. The Glock 26 itself was never recovered. But notably, a Glock 26 — an extended-magazine pistol — was consistent with the description of the intruder's gun given by the victims of the July 28 incident. Officers determined that the Glock 26 and the Nautica suitcase had been stolen in a July 7, 2018 home invasion in Florida, as discussed further below.

2. *Rule 404 (b) Evidence*

On appeal, Lee contends that the trial court erred by admitting evidence of uncharged "other acts" under OCGA § 24-4-404 (b) (Rule

404 (b)). Under that rule, evidence of a defendant's "other crimes, wrongs, or acts" is not admissible to "prove the character of a person in order to show action in conformity therewith," but it may be admissible for "other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404 (b). We review a court's evidentiary rulings under Rule 404 (b) for abuse of discretion. See *Harris v. State*, 321 Ga. 87, 95 (2) (a) (913 SE2d 570) (2025).

(a) Before trial, the state moved in limine to introduce "other acts" evidence under Rule 404 (b). The evidence in question had to do with a home invasion in Florida that took place two weeks before the earliest incident charged in the indictment here. The trial court, after hearing the substance of the evidence through a proffer, granted the State's motion to admit the evidence under Rule 404 (b) and denied the State's alternative request to admit the other acts as intrinsic evidence. In a later written order, the court clarified that the evidence was admissible specifically to show "identity" and "intent" under Rule 404 (b). That evidence was then presented to the

jury, as follows.

In the early morning hours of July 7, 2018, Daniel Woodson returned home after a night out with friends. After getting inside, Woodson remembered he had left his phone charger in his car. When he opened the front door to retrieve the charger, he was confronted by a man pointing a gun at his face. The man with the gun was soft-spoken and was wearing a windbreaker, jean shorts that had a distressed style, and "white and like navy blue Nike shoes." He was not wearing a face mask.

The man pushed Woodson back into the home and into Woodson's bedroom, all the while asking where Woodson's valuables were, and alluding to a safe. The man ordered Woodson to lie on the floor. Woodson complied. The man tried to touch Woodson's genitals, but Woodson defended himself. Then the assailant noticed Woodson's Glock 26 handgun with an extended magazine, which was in the nightstand. The assailant took the handgun and some cash from the nightstand, as well as the case for the gun, which was in a closet.

The assailant left the bedroom. Woodson heard him go to the

kitchen and rifle through some drawers. The assailant returned to the bedroom a few more times to make sure Woodson was still on the floor, then eventually left. Woodson woke his grandparents and told them what happened, and his grandmother called the police.

Responding officers interviewed Woodson and got descriptions of his property that was stolen, including the gun, the gun case, and a set of Nautica luggage. Detectives also got the serial number of the gun, which they entered into a database for stolen guns. Sometime later, the Florida detectives got a call from detectives in Gwinnett County, who reported that they had found some of Woodson's property while investigating another matter — that is, while searching Lee's home. The Georgia detectives also sent Lee's name and photo to the Florida detectives. The Florida detectives used the photo to prepare a sequential photo lineup. Woodson identified Lee as the man who robbed him. He told the police he was "very, very, very certain" that Lee was the perpetrator.

(b) When the State seeks to introduce evidence of a defendant's other acts under Rule 404 (b), it must show that (1) the evidence is

"relevant to an issue in the case other than the defendant's character," (2) the evidence satisfies the balancing test of OCGA § 24-4-403 (Rule 403), which means showing that the probative value of the evidence is "not substantially outweighed" by the danger of unfair prejudice, and (3) there is enough proof to show by a preponderance of the evidence that the defendant committed the other acts. See *Mitchell v. State*, 317 Ga. 107, 110 (1) (891 SE2d 915) (2023); *Thomas v. State*, 314 Ga. 681, 683 (1) (878 SE2d 493) (2022). The trial court found that all these criteria were satisfied, and it specifically found that the Florida evidence was relevant to show intent and identity.

Assuming without deciding that the trial court abused its discretion by admitting the Florida evidence to show intent and identity, the error was harmless. A non-constitutional error is harmless if it is "highly probable that the error did not contribute to the verdict." *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022) (citation omitted). When we assess whether an error was harmless, "we

review the record de novo and weigh the evidence as we would expect reasonable jurors to have weighed it," *Johnson v. State*, 316 Ga. 672, 684 (4) (c) (889 SE2d 914) (2023).

Under that standard, it is highly probable that the admission of the Florida evidence did not contribute to the verdict. Most importantly, the evidence of Lee's guilt in the other offenses was already quite strong. Two eyewitnesses, Johnson and Swindler, picked him out of a lineup, with "sixty" percent and "70 percent" confidence. A large amount of incriminating evidence was found in Lee's home, including stolen property from one of the incidents, clothes and shoes matching those worn by the perpetrator of multiple incidents, and the case for a Glock 26, which was consistent with the perpetrator's gun as described by some witnesses. In addition, Lee was captured on surveillance video wearing those same clothes near some of the crime scenes shortly before the crimes occurred. And he was associated with two different vehicles that were captured in surveillance footage, driving suspiciously, near two of the crime scenes. Given all that evidence of Lee's crime spree, it is highly unlikely that

evidence that Lee committed another home invasion in Florida two weeks before the earliest charged event contributed to the verdict. See *Johnson*, 316 Ga. at 684 (4) (c) (error in admitting graphic pre-autopsy photos was harmless where evidence of guilt was strong and other properly admitted photos were even more graphic); *Hood v. State*, 311 Ga. 855, 869 (5) (860 SE2d 432) (2021) (any error in admitting testimony about images of the victim's family that were visible on the victim's laptop was harmless given the overwhelming evidence of the defendant's guilt). That is especially so because, although the properly admitted evidence was not so strong that the jury was absolutely certain to have found Lee guilty even without the Florida evidence, the State did not make the Florida incident a centerpiece of its case, or use the kind of propensity-based language or arguments that we have considered especially damaging when assessing harmless error. See, e.g., *Morgan v. State*, 307 Ga. 889, 898 (3) (e) (838 SE2d 878) (2020) (admission of video recording was harmless error where the recording "played a minor role" in both the State's case and the defendant's defense). Compare *Harris v. State*,

22

321 Ga. 87, 103-104 (2) (b) (913 SE2d 570) (2025) (erroneous admission under Rule 404 (b) of defendant's prior domestic-violence incidents with other partners was harmful where the State "relied" on the evidence and "leaned into the classic propensity argument throughout its closing," telling the jury that the defendant "control[s] romantic partners with violence. That's what he does. That's what he did in this case.").

Because the admission of the Florida evidence under Rule 404 (b) was highly unlikely to have contributed to the verdict, this claim of error fails.

3. *Severance*

Lee contends that the trial court should have granted his motion to sever the counts arising from the incident of August 2, 2018 — the one that resulted in Kemar Hawkins's death — from the remaining counts charged in the indictment.

A defendant is entitled to have counts severed if the counts were charged together "solely on the ground that they are of the same or similar character." *Lowe v. State*, 314 Ga. 788, 791 (2) (a)

23

(879 SE2d 492) (2022) (citation omitted). But if the counts were charged together instead because they were "based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan," then severance lies within the sound discretion of the trial court. Id. (citation omitted). When the trial court exercises that discretion, it must "determine if severance of the charges would promote a fair determination of the defendant's guilt or innocence." *Harris v. State*, 314 Ga. 238, 281 (4) (875 SE2d 659) (2022) (cleaned up). To that end, the court should "consider whether, in light of the number of offenses charged and the complexity of the evidence, the fact-trier will be able to distinguish the evidence and apply the law intelligently to each offense," *Strozier v. State*, 277 Ga. 78, 81 (5) (a) (586 SE2d 309) (2003) (citation omitted), and it should sever the counts if doing so would "prevent a defendant from being forced to proceed at an unfair disadvantage, due to confusion of law and evidence by the trier of the facts and the 'smear' effect such confusion can produce," *Harris*, 314 Ga. at 281 (4) (cleaned up).

24

First, Lee did not have a right to severance. It is clear that the counts of his indictment were charged together not "solely" because they were of a similar character, but because they were a series of acts closely linked in time and place: a two-week crime spree in Snellville. The crimes were generally similar in nature, mostly involving nighttime break-ins, and there was evidence common to several of the incidents, including the Jordan 11 sneakers, the distressed jean shorts, and the spent 9-millimeter casings. Compare *Doleman v. State*, 304 Ga. 740, 744-745 (3) (822 SE2d 223) (2018) (severance not required where the counts of the indictment charged a "crime spree consist[ing] of an eight-week period during which the co-defendants committed a series of robberies and assaults using the same weapons and stolen vehicles from previous offenses"), with *Mims v. State*, 304 Ga. 851, 857 (2) (b) (823 SE2d 325) (2019) (severance required where "crimes were committed about a month apart and involved different victims in different states" and evidence from earlier crime "had no bearing" on later offenses). So the decision

whether to sever the murder-related counts was within the discretion of the trial court. See *Lowe*, 314 Ga. at 791 (2) (a).

And the trial court did not abuse that discretion. Lee has not argued that his defense was "constrained" in any way by his being tried on all the counts together. See *Pinkins v. State*, 319 Ga. 595, 606 (3) (905 SE2d 596) (2024) (severance not required where defendant was not prevented from pursuing any defense theories in trial of all counts together). And although Lee's trial involved several different offenses committed over different days, with a significant number of testifying witnesses, that is true of many cases. It does not necessarily mean that the jury would not have been able to understand and keep track of the evidence. See id. at 605 (3) (trial with large number of witnesses and exhibits "did not involve particularly complex evidence or an unwieldy number of charges, such that a trier of fact would be unable to distinguish the evidence and apply the law intelligently as to each offense") (cleaned up).

In arguing the latter point, Lee points to an issue that arose with one juror during deliberations. After the jury had been out for

a few hours, the foreperson sent a note to the trial court indicating that one juror felt the evidence was "not enough . . . for him to deliberate." The note went on to say that this juror "cannot keep straight the pieces of evidence associated with each separate incident and believes he needs a hundred percent certainty to make a decision." The trial court brought the juror in question into the courtroom to clarify the problem and to determine whether the juror was still participating in deliberations. The juror then told the court that he had trouble seeing how the robberies and the murder "combine[d]." The juror said:

> [W]e have like a robbery, entering, holding a gun to someone, you know, face to face and taking their wallets, their car, whatever. And then you have another where someone's life has been taken. And I'm trying to separate the two and for some odd reason, I can't see how the — the two combine. [ . . . ] I see the evidence. But when it comes to someone taking another person's life, what I saw, I don't see it. [ . . . ] I keep trying to get to the – that part of the murder because that's where I have all of my – my doubts."

In Lee's view, this was an example of the "smear" effect that can happen when charges are improperly joined. See *Harris*, 314 Ga. at 281 (4). But the record does not show that any such "smearing"

occurred. The juror's comments indicate that he was carefully evaluating the evidence for the different charged offenses. The record does not support that he was confused about the law or the evidence, see id., or unable to "distinguish the evidence and apply the law intelligently to each offense," see *Strozier*, 277 Ga. at 81 (5) (a). And in any event, the fact that one juror may have had questions about the law or the evidence during deliberations does not mean that jury was confused or misled because of the joinder of the counts, or that the trial court abused its discretion by declining to sever the counts before trial.

At bottom, Lee has not shown that being tried on all of the counts together, including the murder-related counts, forced him to "proceed at an unfair disadvantage" due to jury confusion or the impairment of his defense. *Harris*, 314 Ga. at 282 (4). See also *Pinkins*, 319 Ga. at 606 (3); *Price v. State*, 316 Ga. 400, 404-405 (2) (888 SE2d 469) (2023) (trial court had discretion not to sever counts when defendant did not show that being tried for all counts together was

28

unfair to him or confused or misled the jury). The trial court therefore acted within its discretion in denying the motion for severance.

4. *Sufficiency of the Evidence*

Lee contends that the evidence at trial was not sufficient to support his convictions under Counts 10, 11 and 12 for home invasion, aggravated assault, and possession of a firearm during the commission of a felony. Those counts all related to the incident of July 25, when the Blagmans' home was invaded in the middle of the night. Lee argues that each of those charges required the State to prove that he possessed a firearm, and that no admissible direct evidence showed that the perpetrator of the July 25 incident had a gun. In Lee's view, that means the evidence supporting his convictions was insufficient both as a matter of constitutional due process and under Georgia statutory law.

We evaluate a due process challenge to the sufficiency of the evidence by "viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable

doubt." *Henderson v. State*, 317 Ga. 66, 72 (2) (891 SE2d 884) (2023). "[C]onflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts" are for the jury to resolve. *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

Due process allows for a conviction to rest on circumstantial evidence alone, but under Georgia statutory law, a conviction that rests only on circumstantial evidence cannot stand unless the evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. That does not mean, however, that the evidence must exclude every other "*conceivable* inference or hypothesis" — only every *reasonable* one. See *Bates v. State*, 317 Ga. 809, 814 (2) (896 SE2d 581) (2023) (citation omitted). Whether an alternative hypothesis is "reasonable," and whether the circumstantial evidence excludes any such hypotheses, are questions for the jury, see id., and we will not disturb the jury's findings unless they are "insupportable as a matter of law," *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019). (citation omitted).

Here, the evidence was sufficient both as a matter of due process and under OCGA § 24-14-6 to support Lee's convictions on the counts relating to the July 25 incident. Multiple witnesses testified that the perpetrator broke into the home and that they heard gunfire inside the home after he was inside. Later, spent casings were found inside the home. There was no evidence that anyone other than the perpetrator used a gun. The jury was authorized to believe the witnesses' testimony about the gunfire, see *Perkins*, 313 Ga. at 891 (2) (a), and even if none of the witnesses testified that they directly saw the perpetrator with a gun, the jury could reject as unreasonable any hypothesis other than that it was the perpetrator, and not the fleeing victims, who fired the shots. See *Graves*, 306 Ga. at 487 (1).

5. *Instructions on Lesser-Included Offenses*

In a related claim of error, Lee contends that the trial court should have granted his written request to instruct the jury about lesser included offenses for the charges arising from the July 25 in-

cident — about burglary as a lesser included offense of home invasion, and about simple assault as a lesser included offense of aggravated assault. Lee points out that the lesser offenses do not include as an element that the perpetrator has a gun, and he argues again that no evidence showed that the perpetrator of the July 25 incident had a gun.

When a defendant makes a written request for a jury charge on a lesser included offense, the charge "must always be given if there is any evidence that the defendant is guilty" of the lesser offense. *Scoggins v. State*, 317 Ga. 832, 840 (2) (896 SE2d 476) (2023) (citation omitted). The evidence "does not need to be persuasive, but it must exist." *Soto v. State*, 303 Ga. 517, 520 (2) (813 SE2d 343) (2018) (citation omitted). On the other hand, if the evidence shows that the defendant "could have committed only the greater offense as charged or no crime at all," the trial court does not need to instruct the jury on the lesser offense. See *Wilson v. State*, 315 Ga. 728, 736 (6) (883 SE2d 802) (2023).

As an initial matter, Lee is correct that burglary and simple

assault are lesser included offenses of home invasion and aggravated assault, respectively. A lesser offense is "included" within a charged offense if, among other things, it is "established by proof of the same or less than all the facts . . . than is required to establish the commission of the crime charged." OCGA § 16-1-6 (1). See also *Scoggins*, 317 Ga. at 841 (2). A burglary is committed when a person enters an occupied dwelling of another "without authority and with the intent to commit a felony or theft therein," OCGA § 16-7-1 (b), and home invasion is committed when a person, "without authority and with intent to commit a forcible felony therein and while in possession of a deadly weapon," enters the occupied dwelling of another. OCGA § 16-7-5 (b). So a home invasion is a burglary with the added elements of an intended *forcible* felony and the presence of a deadly weapon. Or, put another way, a burglary may be "established by proof of the same or less than all the facts" that establish a home invasion. OCGA § 16-1-6 (1). Similarly, a simple assault happens when a person "[a]ttempts to commit a violent injury to the person of another" or "[c]ommits an act which places another in reasonable

33

apprehension of immediately receiving a violent injury," see OCGA § 16-5-20 (a) (1)-(2), and an aggravated assault is, among other things, an assault "[w]ith a deadly weapon," see OCGA § 16-5-21 (a) (2).

But the trial court here was not required to instruct the jury about the lesser included offenses, because no evidence supported a finding that the perpetrator of the July 25 incident was guilty only of the lesser offenses. The evidence at trial was that the perpetrator broke into the Blagmans' home, gunfire was heard inside the home, and the police later found spent shell casings. Under those facts, the jury could find that Lee committed the charged offenses of home invasion and aggravated assault — the ones involving the use of a gun — or it could find that Lee was not the perpetrator, and thus not guilty of any crime. But there was no evidence from which the jury could find that Lee committed only the lesser offenses of burglary and simple assault — the ones not involving the use of a gun. Because no evidence supported a finding that Lee was guilty only of the lesser charges, no jury instructions on the lesser charges were

required. See *Wilson*, 315 Ga. at 736 (6); *Soto*, 303 Ga. at 520 (2).

6. *Identification*

Lee contends that the trial court should not have allowed a detective to identify him in one of the surveillance videos that was played for the jury. Lee objected to the identification at trial, so our review is for abuse of discretion. See *Bullard v. State*, 307 Ga. 482, 491 (4) (837 SE2d 348) (2019).

(a) When the State was presenting evidence about the July 28 incident, it played surveillance footage recorded at a QuikTrip shortly before the crime. The footage showed a person wearing clothing that matched the description given by the victims of the July 28 home invasion. The State introduced the footage through the testimony of a detective, and it had the detective narrate the video as it was played. Several times during this questioning, the State referred to "the Defendant" when asking about the video. For instance, at one point the State asked, "Were you able to determine what direction the Defendant walked in when he left the QT?" Lee eventually objected to the characterization of the person in the video as

Lee. The State then asked the detective if he had had an opportunity to see Lee during the course of his investigation. The detective said he had observed Lee speaking with other detectives for "a good stretch of time, maybe approximately an hour," and that, based on that observation, he could recognize Lee in the surveillance video. Lee renewed his objection, which the trial court noted.

(b) A witness ordinarily may identify a person in a photo or video if the identification satisfies OCGA § 24-7-701 (a) (Rule 701 (a)). That rule allows a non-expert witness to give opinion testimony so long as the opinion is "[r]ationally based on the perception of the witness," "[h]elpful to a clear understanding of the witness's testimony or the determination of a fact in issue," and "[n]ot based on scientific, technical, or other specialized knowledge." Id. See also *Bullard*, 307 Ga. at 491 (4). As applied to an identification of a person in a photo or video, we have said that Rule 701 (a) is satisfied if there is "some basis for concluding that a witness is more likely to correctly identify a defendant as the individual depicted." *Glenn v. State*, 306 Ga. 550, 555 (3) (832 SE2d 433) (2019) (citation omitted).

36

A number of factors can determine whether a witness is "better equipped than jurors" to correctly identify a person in a video, but the "most critical factor" is "the witness's level of familiarity with the defendant's appearance." *Glenn v. State*, 302 Ga. 276, 280 (II) (806 SE2d 564) (2017) (cleaned up).

Assuming without deciding that the trial court here abused its discretion by allowing the detective to identify Lee in the video, the error was harmless. First, the detective had already identified Lee in the video several times before counsel objected, so the identification the detective made after the objection was overruled was cumulative of his earlier testimony, which minimized the harm of the later identification. See *Moore v. State*, 315 Ga. 263, 271 (3) (b) (882 SE2d 227) (2022) (any error in admitting testimony was harmless when the testimony was cumulative of other, similar testimony). Also, the jury could see for itself that the person in the video was wearing clothing — a grey hoodie, dark blue shorts with holes or tears at the bottom, and what appeared to be Jordan 11 sneakers — very much like the clothing that was later described by the victims

37

of the July 28 home invasion and then found in Lee's home, so it is highly unlikely that the detective identifying Lee in the video made the difference when the jury was deciding whether Lee committed the July 28 crimes. And finally, as explained before, the overall evidence of Lee's guilt was quite strong. See, e.g., *Hood*, 311 Ga. at 869 (5). Given all that, it is highly unlikely that the detective's identification of Lee in the video after the trial court overruled counsel's objection contributed to the verdict. See *Smith*, 313 Ga. at 587.

7. *Cumulative Error*

Finally, Lee contends that the cumulative effect of the errors at his trial requires his convictions to be reversed. To establish cumulative error, Lee must show that "at least two errors were committed in the course of the trial," and that, considered together along with the entire record, the errors "so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *Perrault v. State*, 316 Ga. 241, 248 (3) (887 SE2d 279) (2023) (citation omitted). We have assumed two errors at Lee's trial: the admission of the Florida evidence, and the detective's identification of Lee in the surveillance

video. But even if those errors can be "aggregated for cumulative-error review," see *Washington v. State*, 320 Ga. 839, 861 (6) (912 SE2d 600) (2025), they did not deny Lee a fair trial. Given the weight of the properly admitted evidence of Lee's guilt, the combined effect of these two assumed errors — in which the jury heard that Lee had committed a separate home invasion two weeks before the charged crimes, and it heard the detective repeat that Lee was the man in the surveillance video — was highly unlikely to have contributed to the verdict. In short, Lee has not "explain[ed] to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors." See *Lane v. State*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020). So this claim fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, and Colvin, JJ, concur.*